KAYE SCHOLER LLP
Richard G. Smolev (RS 2222)
Piper A. Brock (PB 6335)
425 Park Avenue
New York, New York 10022
(212) 836-8000 (telephone)
(212) 836-8689 (facsimile)

*Counsel for DFO Partnership*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------X

**DFO PARTNERSHIP,**

                        **Appellant,**

    v.

**DELTA AIR LINES, INC. and**
**THE POST-EFFECTIVE DATE**
**COMMITTEE OF DELTA**
**AIR LINES, INC.,**

                        **Appellees.**

-------------------------------------------------------------X

**Case No. 07-CV-11437 (RJH)**
(ECF Case)

Chapter 11 Case No.
05-17923 (ASH)

(Jointly Administered)

## <u>APPELLANT'S OPENING BRIEF ON APPEAL</u>

31585525.DOC

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..................................................................................... 1

JURISDICTION ............................................................................................................ 8

STANDARD OF REVIEW ............................................................................................ 8

ISSUES ON APPEAL ................................................................................................... 8

STATEMENT OF THE CASE........................................................................................ 9

    1.    The "Test Case" Objections Process.................................................... 9

    2.    The Initial Decision Below ................................................................ 10

    3.    The Bankruptcy Court Invites Motions for Reconsideration.............. 11

ARGUMENT ............................................................................................................... 13

    I.    The Bankruptcy Court Erroneously Construed Section 7(c) of the TIAs............. 13

    II.    The Bankruptcy Court's Novel "Bankruptcy Context" Rule of Contract Interpretation Contradicts Supreme Court Precedent ........................................... 17

    III.    The Bankruptcy Court Erred In Declining To Consider The Uncontroverted Extrinsic Evidence ................................................... 22

CONCLUSION............................................................................................................. 24

# TABLE OF AUTHORITIES

## CASES

*American Express Bank Ltd. v. Uniroyal*, 562 N.Y.S.2d 613 (N.Y. App. Div. 1990) ................ 20

*Astroline Communications Co., Ltd. P'ship v. Astroline Co.,* 1996 U.S. App. LEXIS 24940 (2d Cir. 1996) ........................................................................................................... 8

*Bayerische Hypo-Und Vereinsbank AG v. Banca Nazionale Del Lavoro, S.p.A. (In re Enron Corp.)*, 292 B.R. 752 (Bankr. S.D.N.Y. 2003) ....................................... 22

*Butner v. United States*, 440 U.S. 48 (1979) ................................................................ 19

*DeVanzo v. Newark Ins. Co.*, 353 N.Y.S.2d 29 (N.Y. App. Div. 1974) ...................................... 20

*Fin. One Publ. Co. Ltd. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325 (2d Cir. 2005) ........... 8

*Fiore v. Fiore*, 389 N.E.2d 138 (N.Y. 1979) ................................................................. 20

*In re Delta Air Lines, Inc.*, 2008 WL 161784 (Bankr. S.D.N.Y. 2008) .......................... 11, 15, 19

*Krumme v. West Point Stevens, Inc.*, 238 F.3d 133 (2d Cir. 2000) ............................................ 20

*New York City Off-Track Betting Corp. v. Safe Factory Outlet, Inc.*, 809 N.Y.S.2d 70 (N.Y. App. Div. 2006) ................................................................................................. 22

*Terwilliger v. Terwilliger*, 206 F.3d 240 (2d Cir. 2000) ................................................... 20

*Travelers Cas. & Surety Co. v. Pacific Gas & Elec. Co.*, 127 S. Ct. 1199 (2007) ............. 2, 19, 20

*Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156 (1946) .................................... 19

*Westmoreland Coal Co. v. Entech, Inc.*, 100 N.Y.2d 352 (N.Y. 2003) ........................................ 21

## STATUTES

11 U.S.C. § 502(a) ........................................................................................... 17

11 U.S.C. §101(5)(a) .......................................................................................... 19

## PRELIMINARY STATEMENT

This appeal seeks reversal of the disallowance of eight contractual claims ("DFO Claims")[1], filed by DFO Partnership ("DFO") in the chapter 11 bankruptcy case of Delta Air Lines, Inc. and its affiliates ("Delta" or "Debtor").  The DFO Claims arose out of certain tax indemnity agreements ("Tax Indemnity Agreements" or "TIAs") between Delta and DFO.

In sustaining Delta's objection to the DFO Claims, the United States Bankruptcy Court for the Southern District of New York ("Bankruptcy Court") disregarded the plain language of the contracts and ruled that Delta's contractual obligations under the TIAs must be construed differently "in the context of bankruptcy" than they would be in a state court proceeding.  (D-2, Decision, 14)[2]  The Bankruptcy Court did not conclude that the DFO Claims were unenforceable under applicable state law or under any specific provision of the Bankruptcy Code.  Rather, the Bankruptcy Court found, despite express provisions to the contrary in the contracts, that Delta's bankruptcy filing changed Delta's payment obligations under the contracts.  The Bankruptcy Court set forth its reasoning in a May 16, 2007 decision ("Decision") and subsequently issued (i) the September 20, 2007 order disallowing and expunging the DFO Claims ("Disallowance Order"), and (ii) the November 15, 2007 order ( "Reconsideration Order") denying reconsideration of the Decision and the Disallowance Order.

The Disallowance Order and the Reconsideration Order must be reversed because there is no such thing as a "bankruptcy context" rule of contract interpretation according to *Travelers*

---

[1]    The DFO Claims are numbered 4914, 4915, 4916, 4921, 4925, 4929, 4930 and 4938.

[2]    "D-__" refers to documents enumerated in the Appellant's Designation of Record and Statement of Issues Presented on Appeal [Docket No. 4], and "CD-__" refers to documents enumerated in Delta's Counter-Designation of Items for Inclusion in Record on Appeal [Docket No. 5].

*Cas. & Surety Co. v. Pacific Gas & Elec. Co.*, 127 S. Ct. 1199 (2007) ("*Travelers*"), and a long line of United States Supreme Court precedent.

The DFO Claims arose from certain leveraged lease transactions[3] in which Delta acquired possession and use of eight aircraft ("Aircraft").  DFO paid part of the purchase price for the Aircraft by way of an investment through an "Owner Trust" administered by an "Owner Trustee."  Delta then leased the Aircraft from the Owner Trusts under separate "Leases" and the Owner Trustee pledged the Leases and the Aircraft to an "Indenture Trustee" under an "Indenture" as security for the nonrecourse debt that financed the remainder of the purchase price.  As the "Owner Participant" of the Owner Trusts, DFO reported the income and deductions from the ownership of the Aircraft for federal income tax purposes.  Each Indenture and Lease requires Delta to make all payments of "Rent" (as therein defined), with only certain exceptions, directly to the Indenture Trustee.  The distribution or "waterfall" provisions of the Indenture require the Indenture Trustee to pay its fees and expenses, and any amounts then due to the debtholders, out of the Rent payments, and then to distribute any remaining Rent to the Owner Trustee, which in turn is required by the provisions of its trust agreement to pay such amounts to the Owner Participant.

Because it owned the Aircraft for federal income tax purposes, DFO was entitled to depreciate the Aircraft for tax purposes.  The "sale" of these tax benefits to the Owner Participant through the use of a leveraged lease financing structure enabled Delta to acquire

---

[3]      The structure and economics of the typical leveraged aircraft lease are described in TIA/SLV Objection 1:  Objection by Delta Air Lines, Inc. and the Official Committee of Unsecured Creditors to Certain Claims Filed by DFO Partnership and the Bank of New York for Tax Indemnities and Stipulated Loss Values ("TIA/SLV Objection 1") (D-7), 4-7, and the Response of DFO Partnership to TIA/SLV Objection 1 ("DFO Response") (D-9), 6-8.

possession and use of each Aircraft during the term of the Lease at a substantially lower cost than otherwise available to it.

To protect the Owner Participant from any loss of these tax benefits due to acts or omissions of Delta during the terms of the Leases, Delta and the Owner Participant entered into the Tax Indemnity Agreements at issue in this case. Delta's bankruptcy filing and its failure to pay Rent were events of default that allowed the Indenture Trustee, as assignee of the Owner Trustee, to exercise remedies under the Leases. Among the remedies specifically enumerated in each Lease are several that, depending upon the relevant facts at the time, would allow the Indenture Trustee to demand payment by Delta of an amount of Rent listed on a schedule to the Lease and defined as "Stipulated Loss Value" or "SLV."

The remedies described above would result in the recapture of tax benefits previously taken by the Owner Participant in connection with the transaction, and in the Owner Participant's incurring millions of dollars in tax liability as a result. The TIAs generally required Delta to indemnify the Owner Participant for this loss of tax benefits and resulting liability, which the TIAs define as a "Loss." Section 7(c) of the TIAs, however, states that Delta could be relieved of this indemnity obligation if the Loss results from "any event whereby a party to any of the Operative Documents is required to pay Stipulated Loss Value."

The reason for this exclusion is evident from the terms of the documents and from affidavits submitted by DFO: SLV is a specific dollar amount set forth in a schedule to the Lease that always will be sufficient to pay off the debt, to provide some return to the Owner Participant, including an amount to compensate the Owner Participant for its loss of the residual value of the Aircraft upon foreclosure, and to reimburse the Owner Participant for its tax liability resulting from these remedial events. By definition, the amount of SLV on the schedule always

must at least equal the amount of the principal and interest on the debt then outstanding under the Indenture. If SLV is paid in full in cash, as required by the relevant documents, then the debt would be repaid and the excess of SLV over the amount of the debt would be returned under the waterfall provisions of the Indenture to the Owner Trustee, for distribution to the Owner Participant. This payment effectively would reimburse the Owner Participant for its tax liability resulting from Delta's default.

In this case, however, the Indenture Trustee and Delta entered into side agreements ("Restructuring Agreements") not expressly contemplated by the Leases (or consented to by the Owner Trustee or the Owner Participant). The Restructuring Agreements required the Indenture Trustee to foreclose upon the Owner Trustee's title to each Aircraft (thus depriving the Owner Participant of the residual value of the Aircraft and causing the tax recapture described above), and then to enter into restructured leases with Delta pursuant to which Delta received more favorable payment terms than under the Leases. Delta agreed in the Restructuring Agreements to give the Indenture Trustee an allowed claim calculated as SLV minus the residual value of the Aircraft and minus the present value of the payment streams under the restructured leases ("IT Claims"). The allowed claim was to be paid in stock in the reorganized Delta, which was worth approximately fifty cents on the dollar at the time of Delta's emergence from bankruptcy, meaning that the Indenture Trustee would never fully recover its debt and nothing would be paid to DFO under the waterfall of the Indenture.

DFO timely filed the DFO Claims in Delta's bankruptcy proceeding in order to recover from Delta under the TIAs the amounts of its tax Losses resulting from the events described above. Delta initially objected to the DFO Claims on the grounds that the Indenture Trustees had demanded that it pay full SLV under Section 15(e) of the Lease. When DFO demonstrated that

was not the case (by delivering copies of the Restructuring Agreements that had not been available when the matter first was argued), Delta then switched its argument to say that the IT Claims were being made under Section 15(c) of the Lease because both started with SLV and reduced it by the fair market value of the Aircraft.  (D-25, TIA/SLV Objection 1:  Reply Memorandum of Delta Air Lines, Inc. and the Official Committee of Unsecured Creditors, 10-11; D-40, DFO Partnership's Motion for Reconsideration of Order dated September 21, 2007 with Respect to TIA/SLV Objection 1 ("Second Reconsideration Motion"), ¶ 18)  When DFO noted that Delta had mischaracterized the Lease in making that argument (because it is required to pay full SLV when the lessor does not take possession of the Aircraft), Delta again changed its argument and said that the broad language of the last remedy provision in Section 15 of the Lease allowed the compromise embodied in the Restructuring Agreements and thus constituted a payment of SLV so as to trigger the TIA exclusion (any such defense based on the TIA exclusion, the "Section 7(c) Defense").  (D-40, Second Reconsideration Motion, ¶¶ 13-19)

Each leveraged lease transaction at issue here was documented in a highly complex, precisely drafted set of interrelated agreements ("Operative Documents"), consisting principally of (i) the "Participation Agreement," (ii) the Lease, (iii) the Indenture, and (iv) the Tax Indemnity Agreement.  All of these Operative Documents are governed by New York law.

In accordance with well established rules of contract construction, in order to interpret such contracts, a court must look first to the plain language of the contract, interpret related contracts as a whole, and consider the contract language in light of the customs, practices, usages and terminology (including, especially, terms that the parties specifically defined) as generally

understood by participants regularly engaged in the particular business.[4]  In the context of highly

specialized leveraged lease financings, unless the court otherwise has expertise in such

financings, which the Bankruptcy Court admitted it did not (D-26, Tr. 3/2/07, 7), this requires

that the court consider extrinsic evidence from the parties to assist in its interpretation of the

contracts.  DFO submitted such evidence, but the Bankruptcy Court ignored it, as well as

provisions in the contracts cited by DFO which expressly contradicted the Bankruptcy Court's

interpretation of the disputed language.  Delta submitted no evidence supporting its interpretation

of the contracts, and indeed, its counsel misstated the terms of the documents (D-28, Tr. 3/30/07,

35 line 21) and Delta never rebutted DFO's evidence with evidence of its own.

  The Bankruptcy Court found that the disputed contract language was unambiguous and

that no extrinsic evidence of the parties' intent was necessary to aid its interpretation.  The

Bankruptcy Court then implicitly contradicted its finding that the contracts were unambiguous,

as follows:  although Section 7(c) of the TIA required a payment of SLV (defined as a specific

amount) in order to relieve Delta of its indemnity obligations, and although the Lease required

such payment to be made in U.S. dollars and immediately available funds, and expressly stated

that Delta's bankruptcy filing would not change Delta's payment obligation, the Bankruptcy

Court found that the TIA's requirement must be interpreted "in the context of bankruptcy" with

the result that the Indenture Trustee's receipt of non-cash proceeds (the common stock of Delta

to be distributed on the IT Claims, the residual value of the Aircraft and chattel paper in the form

of the restructured leases) having an aggregate value that was less than SLV, as defined, satisfied

---

[4]  Leveraged leasing is a highly specialized method of financing — regularly engaged in by
  sophisticated parties who are represented by counsel experienced in such financings —
  and involves as its driving force the impact of the financing structure on the parties under
  U.S. federal income tax law, itself a highly specialized area of the law.

the unambiguous requirement of the Leases that SLV be paid in the specified amount in U.S. dollars and in immediately available funds.  Remarkably, the Bankruptcy Court reached this conclusion <u>without</u> <u>citation</u> to a single legal authority or contractual provision supporting that proposition.  Rather, the Bankruptcy Court's Decision proceeded from its own policy-based rationale that contractual obligations must mean one thing when enforced outside of bankruptcy and another thing when enforced in a bankruptcy proceeding, if the parties contemplated that at some point the obligor might become a debtor in bankruptcy — which, of course, is true of most contracts with commercial obligors.  In so reasoning, the Bankruptcy Court implicitly rejected the Supreme Court's mandate that, absent a specific provision of the Bankruptcy Code to the contrary, the contract terms must mean the same thing — and produce the same result — in a bankruptcy courtroom as in a state court.

   If this matter had come before a New York state court in an enforcement action by DFO based on the undisputed facts, Delta would not have prevailed on its Section 7(c) Defense, because no party to these transactions has been "required to pay SLV" in the amount and in the medium for payment specified in the Operative Documents.  Instead of a <u>full</u> <u>recovery</u> for its Losses from either the waterfall of the Indenture (upon payment of full SLV in U.S. dollars) or through the TIA, as would happen outside of bankruptcy, the Bankruptcy Court's "bankruptcy context" interpretation results in <u>no</u> <u>recovery</u> for DFO.[5]

---

[5]    When asked by the Bankruptcy Court whether he was contending that Delta could reach an agreement with the Indenture Trustee that would "wipe out the tax indemnification portion or component of the SLV, and yet [Delta] would retain [its] right under Section 7(c) to preclude any tax indemnification claim," Delta's counsel denied that Delta was doing so.  After acknowledging that "I wouldn't have thought that it would be [Delta's position]", the Bankruptcy Court then construed the various agreements in a way that did just that. (D-28, Tr. 3/30/07, 10)

The Bankruptcy Court's application of its novel "bankruptcy context" rule of contract interpretation and its refusal to determine DFO's contract claims under applicable standards of New York law constitutes reversible error. DFO respectfully requests this Court to (i) reverse the Disallowance Order and the Reconsideration Order, direct the Bankruptcy Court to enter an order allowing the DFO Claims as to liability, and remand for determination of their proper amounts, or (ii) alternatively, remand for further evidentiary proceedings and direct the Bankruptcy Court to consider extrinsic evidence with respect to the meaning of the relevant contractual provisions.

## JURISDICTION

On September 20, 2007, the Bankruptcy Court entered the Disallowance Order, *inter alia*, disallowing and expunging the DFO Claims. The Disallowance Order is a final order determining the DFO Claims. This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 158(a)(1).

## STANDARD OF REVIEW

This appeal involves solely questions of contract interpretation which, as matters of law, are subject to *de novo* review by this Court. *See Fin. One Publ. Co. Ltd. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 339 (2d Cir. 2005) ("We review contract interpretation *de novo.*"); *Astroline Communications Co., Ltd. P'ship v. Astroline Co.*, 1996 U.S. App. LEXIS 24940, at *5 (2d Cir. 1996) ("In assessing a bankruptcy court's interpretation of a contract, we review its textual interpretation *de novo* . . . .").

## ISSUES ON APPEAL

1.      Whether the Bankruptcy Court erred as a matter of law in holding that the requirements of Section 7(c) of the TIA, which relieve Delta from its tax indemnity obligations under the TIAs if a party to any of the Operative Documents "is required to pay SLV," are

satisfied by the Indenture Trustee's receipt of non-cash consideration, only a portion of which will be monetized to provide the Indenture Trustee with U.S. dollars, which then will constitute only a fraction of SLV, when the Lease requires all of SLV to be paid in U.S. dollars notwithstanding any bankruptcy of Delta.

2.    Whether the Bankruptcy Court erred as a matter of law by applying a "bankruptcy context" rule of interpretation to the contracts at issue, given that *Travelers* and other controlling precedents require that the DFO Claims be determined in accordance with applicable state law and its rules of contract interpretation.

3.    Whether the Bankruptcy Court erred as a matter of law in declining to consider the uncontroverted extrinsic evidence presented by DFO with respect to the meaning of Section 7(c) of the TIAs.

## STATEMENT OF THE CASE

### 1.    The "Test Case" Objections Process

Delta initially tried to file a blanket objection to approximately $1 billion in tax indemnity claims filed by the owner participants of its leveraged lease aircraft, contending that as the TIA and IT claims overlapped, one or both should be disallowed.  When rebuffed, Delta and the Unsecured Creditors Committee next initiated a "test case" process and selected the DFO Claims for the first test case objection.  (D-7, TIA/SLV Objection 1)  This objection was heard in tandem with an objection to claims filed by The Northwestern Mutual Life Insurance Company ("Northwestern Mutual").  Delta also filed three other "test case" objections, contending that each case group involved TIAs with similar language that permitted similar analysis.

TIA/SLV Objection 1 was heard on March 2, 2007 and again, together with TIA/SLV Objection 2 (involving Northwestern Mutual), on March 30, 2007.  Further hearings on TIA/SLV Objection 1 occurred on May 21, August 20 and November 6, 2007.  A hearing on

TIA/SLV Objection 2 was held on July 10, 2007. The Bankruptcy Court incorporated the reasons stated in its Decision, as supplemented and/or modified by statements it made on the record in the hearings on May 21, July 10 (regarding TIA/SLV Objection 2) and August 20, 2007, into its Disallowance Order of September 20, 2007 with respect to the DFO Claims. The Bankruptcy Court then incorporated into its Reconsideration Order the reasoning referenced in the Disallowance Order, together with the statements made by the Bankruptcy Court on the record at the November 6, 2007 hearing.

### 2.    The Initial Decision Below

On May 16, 2007, the Bankruptcy Court issued its Decision on TIA/SLV Objections 1 and 2, overruling the objections in part and sustaining them in part. (D-2, Decision) First, the Bankruptcy Court overruled Delta's general objection that the Owner Participants' TIA claims and the IT Claims were duplicative as a matter of law, dubbing this argument the "cosmic" objection due to its lack of any apparent grounding in fact or law. (D-2, Decision, 6-8)

Regarding the TIA exclusion, the Bankruptcy Court found that Section 7(c) of the TIAs was unambiguous, that the Indenture Trustee had demanded payment of SLV under Lease Section 15(e), that Delta therefore was required to pay SLV and that the exclusion applied. (D-2, Decision, 10) Accordingly, the Bankruptcy Court (i) disallowed DFO's TIA claims, and (ii) disallowed all but one of Northwestern Mutual's TIA claims. The Decision also concluded with respect to Northwestern Mutual's TIA claims, which involved a differently worded TIA exclusion, that the parties intended payment in "bankruptcy dollars" — *i.e.*, a distribution on the allowed claim in stock rather than cash — to qualify as "payment" of SLV within the meaning of the TIA exclusion, even though Northwestern Mutual's documents require payment of SLV, or an amount determined by reference thereto, in cash. The Bankruptcy Court found that the word "pays" must be "construed in such a manner as to comport with the meaning of payment in the

context of bankruptcy, which the parties expressly contemplated in the TIA, as well as in the other agreements."  (D-2, Decision, 14)

### 3.     The Bankruptcy Court Invites Motions for Reconsideration

The Bankruptcy Court immediately had second thoughts about its own ruling and took the highly unusual step of *sua sponte* convening a conference to discuss whether the Decision was accurate and covered all of the issues.  (D-30, Notice of Tel. Conf.)  During the telephonic hearing, the Bankruptcy Court acknowledged that it had made mistakes in the Decision and invited motions for reconsideration on the contract interpretation issues.  (D-31, Tr. 5/21/07, 56)

Thereafter, the parties made cross-motions for reconsideration.  (D-32, DFO's Motion for Reconsideration ("First Reconsideration Motion"); D-34, Northwestern Mutual's Motion for Reconsideration; D-33, Delta's Motion for Reconsideration)  On July 10, 2007, the Bankruptcy Court announced its rulings on the cross-motions regarding Northwestern Mutual's TIA claims.  Without permitting the introduction of extrinsic evidence, the Bankruptcy Court found that the mere mention of the term "bankruptcy" in certain of the documents must have meant that the parties drafted the contracts in "contemplation of bankruptcy" with the intention that requirements such as payment "in U.S. Dollars and in immediately available funds" (D-13 Ex. A, Lease §3(d)) would be read entirely out of the documents in the bankruptcy claims allowance process.  (CD-3, Tr. 7/10/07, 12-13)  The Bankruptcy Court then reversed its Decision with respect to the one Northwestern Mutual claim that it previously had allowed, and disallowed that claim as well.  *In re Delta Air Lines, Inc.*, 2008 WL 161784, at *1 n.1 (Bankr. S.D.N.Y. 2008) (*citing* (D-38, Tr. 8/20/07, 64)).

In a hearing on August 20, 2007, DFO's First Reconsideration Motion was argued before the Bankruptcy Court and the Bankruptcy Court for the first time articulated its belief that "the concept of payment of SLV means the concept of payment of the net of SLV, less fair market

value or sale value . . . ." and that "Section 7(c) cannot mean SLV without [these] offsets . . . ."
(D-38, Tr. 8/20/07, 58-59)  The Bankruptcy Court then denied DFO's First Reconsideration
Motion on the record at the hearing, and later, on September 20, 2007, issued the Disallowance
Order.  (D-3, Disallowance Order, 2)

   The Bankruptcy Court had made findings during the hearings which were radically
inconsistent with its findings on the same facts in its Decision.  It first found in its Decision that
Section 7(c) of the TIAs was unambiguous when it used the term "SLV" to mean a specific
amount, as defined by the parties.  (D-2, Decision, 12)  It then found during the August 20
hearing that "SLV" instead meant "the net of SLV" after offsets not included in the definition of
"SLV."  (D-38, Tr. 8/20/07, 58)  It also found in its Decision that payments under the "Bingham"
term sheet (which, although applicable to Northwestern Mutual's aircraft rather than DFO's
Aircraft, were calculated pursuant to the same formula used in the Restructuring Agreements),
required payment of an amount significantly less than SLV (D-2, Decision, 14-15), but then
found during the August 20 hearing that because the Restructuring Agreements provided for a
claim against Delta that was calculated in a manner similar to the payments required by Delta
under certain remedies provisions of the Lease (although these provisions of the Lease applied
only when the Aircraft had been repossessed by the Indenture Trustee and the Restructuring
Agreements specifically precluded such repossession), the payments required by the
Restructuring Agreements constituted payments of SLV.  (D-38, Tr. 8/20/07, 58-59)  DFO
immediately filed its Second Reconsideration Motion on September 21, 2007 (D-40), as soon as
the Disallowance Order was issued.

   In its Second Reconsideration Motion, DFO identified the inconsistencies described
above and asked the Bankruptcy Court to consider extrinsic evidence of the parties' intent

regarding these matters, as the Bankruptcy Court itself had issued two different, inconsistent rulings on these issues.  (D-40)  In support of that motion, DFO filed an affidavit of David B. Gebler, sworn on September 12, 2007 ("Second Gebler Affidavit"),[6] and an affidavit of Mitchell E. Menaker, sworn on September 19, 2007 ("Menaker Affidavit"), both of whom were involved in the negotiation and drafting of the Operative Documents and both of whom represented that when used in Section 7(c) of the TIA, "SLV" meant the full amount as calculated in the Operative Documents and not a lesser amount and that "pay" meant payment in immediately available funds and no other medium.  The averments in the Second Gebler Affidavit and the Menaker Affidavit were never controverted by any affidavits or other evidence from Delta or any other party in interest.

On November 6, 2007, the Bankruptcy Court held a hearing on the Second Reconsideration Motion.  Notwithstanding DFO's uncontroverted evidence, the Bankruptcy Court issued an order dated November 15, 2007, *inter alia*, (i) denying the Second Reconsideration Motion, and (ii) disallowing and expunging the DFO Claims. (D-4)

On November 26, 2007, DFO timely filed its appeal from the rulings with respect to these contract interpretation issues.  (D-1, DFO Notice of Appeal)

## ARGUMENT

**I.    The Bankruptcy Court Erroneously Construed Section 7(c) of the TIAs**

The facts relating to the contracts — *i.e.*, their existence and express terms — are not disputed.  Copies of the agreements relating to the N914DL leveraged lease transaction were properly authenticated and offered in evidence by DFO.  (D-13, Ex. Nos. A-D)  It is undisputed

---

[6]    Mr. Gebler had previously submitted an affidavit dated March 1, 2007.  (D-10)

that Delta's bankruptcy filing and failure to pay Rent were events of defaults under the Leases and the sole basis under the Operative Documents for the Indenture Trustee's foreclosures on the Aircraft, which in turn caused DFO tax Losses and triggered Delta's indemnity obligations under the TIAs.  (D-13 Ex. B, TIA §6(a))

Without citations to any authority or evidence from persons involved in negotiating the Operative Documents, Delta contended that the phrase "required to pay SLV" in the TIA had to be construed to mean the amount that Delta would pay if the lessor (or the Indenture Trustee, as its assignee) enforced remedies under the Lease, repossessed the Aircraft and disposed of them (through sale or lease), and then demanded that Delta pay the difference between SLV as calculated in accordance with the Lease and the amounts realized from such disposition.  Again without supporting authority, Delta further contended that its payments under the Restructuring Agreements were equivalent to what it would pay if the lessor enforced remedies under the Lease.  As DFO noted, however, this argument mischaracterized the Lease:  outside of bankruptcy, if the lessor did not repossess the Aircraft (which the Indenture Trustee did not), the Leases would require Delta to pay full SLV, without the offsets taken by Delta under the Restructuring Agreements.  (D-40, Second Reconsideration Motion, ¶¶ 13-19)

Hence, the Bankruptcy Court erred when it found, based on Delta's arguments, that "Section 7(c) [of the TIA] cannot mean SLV without the offsets that are provided for in every subdivision of Section 15 [of the Lease] that refers to SLV, because in that case, you would never have an occasion to invoke Section 7(c) of the TIA."  (D-38, Tr. 8/20/07, 58-59)

The Bankruptcy Court also erred in not applying the provisions of Lease Section 15 to the actual facts involving these Aircraft, before finding that the Restructuring Agreements provided for payments by Delta in the same amounts as required by Section 15.  Had it done so

(as DFO requested), it would have found that each of Sections 15(c), (d) and (e), the only subdivisions of Section 15 that mention SLV, would have required Delta to pay the full amount of SLV without offsets for the residual value of the Aircraft and the present value of rent under the restructured leases.  Inexplicably, although complete copies of the Lease and each Restructuring Agreement were in the record before it, the Bankruptcy Court dismissed this point by DFO as inapplicable to this case.  (D-46, Tr. 11/6/07, 66-67)

The Bankruptcy Court further erred in finding (contrary to the unrebutted Second Gebler and Menaker Affidavits) that, because the Lease remedies under certain facts allow offsets to SLV, the parties must have intended that the term SLV in the TIA Section 7(c) would mean a lesser amount, rather than the precisely defined term.  (D-38, Tr. 8/20/07, 58)  There is no basis under any provision of the Operative Documents for this finding.

Further, the Bankruptcy Court clearly erred in finding that, when TIA Section 7(c) uses the words "to pay" SLV, this was intended by the parties to apply to a payment in stock or any other non-cash medium of payment, as well as to payments in U.S. dollars.  In its recent Decision on TIA/SLV Substitute Objection 3 and Objection 5I, issued on January 16, 2008 ("January 16 Decision"), the Bankruptcy Court discusses its May 16 Decision and interprets similar TIA provisions.  *In re Delta Air Lines, Inc.*, 2008 WL 161784, at *1 (Bankr. S.D.N.Y. 2008).  The Bankruptcy Court quotes definitions of the word "pay" from 10 different dictionaries to support the proposition that "pay" means "satisfaction of a debt by money or property."  *Id.* at *7.  Only where parties do not specify the medium for payment in their contracts would dictionary definitions of the word "pay" have some relevance.

In this case, however, the parties were very specific in their agreements as to the medium in which Delta was required to make payments under the Lease, whether for SLV or any other amount.  Section 3(d) of the Lease provides as follows:

> Manner of Making Payments. . . .  All payments pursuant to this Lease shall be made by 12:00 noon Eastern Standard (or Daylight) Time on the date payment is due **in U.S. Dollars and in immediately available funds**.

(D-13 Ex. A, Lease §3(d)) (emphasis supplied)

Similarly, Section 13 of the TIA requires all payments thereunder to be made in immediately available funds or by check:

> Payments. . . .  Payments made by Lessee or the Owner Participant pursuant to this Indemnity Agreement shall be made by wire transfer **of immediately available funds** to such bank and/or account in the continental United States as specified by the other party, **and if no such direction shall have been given, by check payable to the order of such payee** and mailed to such other party by certified mail, postage prepaid.

(D-13 Ex. B, TIA §13) (emphasis supplied)

Nothing in the Operative Documents authorizes Delta to substitute a payment in stock or in any other non-cash medium for the payment in immediately available funds in U.S. dollars that it is required by Section 3(d) of the Lease when paying SLV thereunder, regardless of whether such payment obligation becomes operative when Delta is in bankruptcy.  Indeed, the opposite is true:  Section 20 of the Lease specifically states that:

> Lessee's obligations to pay all Rent [defined to include SLV] . . . payable hereunder . . . shall be absolute and unconditional and shall not be affected by any circumstance whatsoever, including, without limitation . . . (c) any insolvency, bankruptcy, reorganization or similar proceedings by or against Lessee . . , or (d) any other circumstances whatsoever, whether or not unforeseen or similar to any of the foregoing.

(D-13, Ex. A, Lease §20)  This provision of the Lease thus confirms the Bankruptcy Court's speculation that the parties must have contemplated that Delta might become a debtor in bankruptcy.  (D-2, Decision, 14)  Section 20 directly contradicts the Bankruptcy Court's

conclusion, however, that the parties must have intended Delta's payment obligations to be "construed in such a manner as to comport with the meaning of payment in the context of bankruptcy . . . ." Rather, Lease Section 20 evidences the intent of the parties that Delta's bankruptcy should have no affect whatsoever on its payment obligations under the Lease.

Thus, the Bankruptcy Court was clearly wrong when suggesting that the parties "must have intended" for there to be a reduction or alteration of Delta's payment obligations if it filed for bankruptcy relief.

## II.    The Bankruptcy Court's Novel "Bankruptcy Context" Rule of Contract Interpretation Contradicts Supreme Court Precedent

A venerable line of United States Supreme Court case law has established the black-letter-law principle that governs this case:  claims based on the terms of enforceable, state-law-governed contracts must be allowed in bankruptcy cases, absent a provision of the Bankruptcy Code expressly requiring their disallowance.  This principle was reiterated most recently by the Supreme Court in *Travelers*, which was decided while this matter was pending below.  Neither Delta, nor the Bankruptcy Court, has identified any Bankruptcy Code provision requiring disallowance of the DFO Claims.  Therefore, the DFO Claims must be allowed unless Delta would have had a valid defense to liability under New York state law, which governs these contracts.  Because Delta's purported Section 7(c) Defense is not valid under New York state law, it is not valid in this case.  This basic principle is at the heart of this appeal.

The Bankruptcy Court's approach to contract interpretation in this case improperly conflates two separate and entirely distinct issues:  (1) the claims allowance question, *i.e.*, whether DFO has a "claim" that "shall" be allowed pursuant to 11 U.S.C. § 502(a) because it has a "right to payment" and an "enforceable obligation" under applicable state law; and (2) the claims discharge question, *i.e.*, how much Delta must pay in order to discharge DFO's state-law-

determined claim under its plan of reorganization.  Only the <u>discharge</u> issue, not the <u>allowance</u> issue, is a matter of bankruptcy law in this case.  Whether Delta is liable on the DFO Claims depends upon whether it has proven a valid defense under the Operative Documents.  In contrast, whether Delta may <u>discharge</u> the DFO Claims or the IT Claims <u>after</u> they have been allowed by paying 50¢ in "bankruptcy dollars" upon plan confirmation is not properly before this Court on the claims <u>allowance</u> question that is at issue here.

The Bankruptcy Court disregarded the Operative Documents' express requirements — and the uncontroverted evidence set forth in the Second Gebler Affidavit and the Menaker Affidavit — that payment of the full SLV amount in cash was the necessary prerequisite for Delta to establish a contractual Section 7(c) Defense to the DFO Claims.  In so ruling, the Bankruptcy Court imposed its version of a special "bankruptcy" rule of contract interpretation, stating:

> The word "pays" and the phrase "or an amount determined by reference thereto" **must be construed in such a manner as to comport with the meaning of payment in the context of bankruptcy**, which the parties expressly contemplated in the TIA, as well as in the other agreements.  There is rarely likely to be full payment of claims in bankruptcy, and in the ordinary course of any Chapter 11 case payment of claims under a plan may be in cash or equity or debt securities of the debtor or a combination of cash and securities.

(D-2, Decision, 14) (emphasis supplied)

Although the Bankruptcy Court denied that it was applying a special bankruptcy rule of contract interpretation (CD-3, Tr. 7/10/07, 11-14), its later decision in other test cases (relating to Objection 3 and Objection 5I), it made clear that this was precisely what it was doing:

> To recapitulate, TIA §§ 7(c) in Objection 3 and 6(c) in Objection 5I, and particularly the terminology "pay/paid" and "pays an amount equal to" in those provisions are not ambiguous. The pay/paid/pays terminology  are words of common usage and understanding with consistent lay and legal dictionary definitions. **To construe pay/paid/pays to mean in cash in full is a rational interpretation of the words in the context of a solvent airline/lessee not in bankruptcy, since a money debt normally would not otherwise be satisfied**

**and discharged. But to construe pay/paid/pays to mean in cash in full in the context of an airline which is insolvent and in bankruptcy is irrational, because an insolvent airline/lessee in bankruptcy is incapable of paying SLV in cash in full for lack of the cash resources to do so, and it is barred from doing so by the Bankruptcy Code.** Contract provisions must be interpreted in the factual and legal context in which the provisions may be expected to become operative. The parties to these transactions unquestionably understood that SLV would most likely become payable in the context of insolvency and bankruptcy. The parties cannot have contemplated or expected SLV to be paid in cash in full, knowing that this would not be practically and legally possible. The only meaning of pay/paid/pays which can rationally be ascribed to such terminology in the context of an insolvent and bankrupt airline/lessee is the common dictionary meaning of payment in the sense of discharge of the indebtedness as a matter of fact and law. This definition is rational and conforms to the parties' reasonable contemplation and expectation in all circumstances, whether SLV is required to be paid by a solvent airline not in bankruptcy, or an insolvent airline after filing its bankruptcy petition. Courts are barred under the parol evidence rule from considering extrinsic evidence to vary or change the unambiguous terms of a written agreement.

*In re Delta Air Lines*, 2008 WL 16178, at *22 (Bankr. S.D.N.Y. Jan. 16, 2008) (emphasis supplied) (footnote omitted).

The Bankruptcy Court's novel approach — that the terms of a contract should be interpreted differently if one of the parties happens to file for bankruptcy — is directly contrary to the controlling Supreme Court precedent set forth in *Travelers*:

> [W]e have long recognized that the "'basic federal rule' in bankruptcy is that **state law governs the substance of claims**, Congress having 'generally left the determination of property rights in the assets of a bankrupt's estate to state law.' Accordingly, when the Bankruptcy Code uses the word "claim" – which the Code itself defines as a "right to payment," – it is usually referring to a right to payment recognized under state law. As we stated in *Butner*, "[p]roperty interests are created and defined by state law," and "[u]nless some federal interest requires a different result, **there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding.**"

*Travelers*, 127 S. Ct. at 1205 (*quoting* 11 U.S.C. §101(5)(a) and *Butner v. United States*, 440 U.S. 48 (1979)) (*citing Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156, 161 (1946)) (emphasis supplied).

The absence of textual support is fatal for the [so-called *Fobian* rule – which dictates that "attorney fees are not recoverable in bankruptcy for litigating issues 'peculiar to federal bankruptcy law.'"]  Consistent with our prior statements regarding creditors' entitlements in bankruptcy, we generally presume that **claims enforceable under applicable state law will be allowed in bankruptcy unless they are expressly disallowed**.  11 U.S.C. §502(b).  Neither the court below nor PG&E has offered any reason why the fact that the attorney's fees in this case were incurred litigating issues of federal bankruptcy law overcomes that presumption.

*Id.* at 1205-06 (emphasis added) (citations omitted).

Thus, the Supreme Court's pronouncements in *Travelers* could not have been more clear — (i) a claimant's substantive rights with respect to its claim are to be determined under applicable state law absent a compelling federal interest, and (ii) to the extent that a claim is enforceable under state law, it ordinarily must be allowed in bankruptcy unless the Bankruptcy Code itself expressly disallows the claim.  Notably, Delta did not contend, and the Bankruptcy Court did not conclude, that DFO Claims would be unenforceable under applicable state law (*i.e.*, the law of New York).

Indeed, it is quite obvious that the DFO Claims would be enforceable under New York law.  Under New York law, "[a] court may neither rewrite, under the guise of interpretation, a term of the contract when the term is clear and unambiguous, nor redraft a contract to accord with its instinct for the dispensation of equity upon the facts of a given case."  *Terwilliger v. Terwilliger*, 206 F.3d 240, 245 (2d Cir. 2000) (*citing Fiore v. Fiore*, 389 N.E.2d 138, 139 (N.Y. 1979) *and DeVanzo v. Newark Ins. Co.*, 353 N.Y.S.2d 29 (N.Y. App. Div. 1974)).  "Under New York law, therefore, a court must enforce that plain meaning, 'rather than rewrite an unambiguous agreement.'"  *Krumme v. West Point Stevens, Inc.*, 238 F.3d 133, 139 (2d Cir. 2000) (*quoting American Express Bank Ltd. v. Uniroyal*, 562 N.Y.S.2d 613, 614 (N.Y. App. Div. 1990)).  Said another way, a state court would neither read "SLV" to mean "net SLV" nor

substitute a requirement that payments be made in immediately available funds with a finding that payments could be made in stock and in negotiated credits.

Additionally, Delta did <u>not</u> contend, and the Bankruptcy Court did <u>not</u> conclude, that any provision of the Bankruptcy Code expressly (or impliedly) requires the <u>disallowance</u> of the DFO Claims.  Accordingly, under the *Travelers* mandate, the Bankruptcy Court erred in disallowing the DFO Claims.

The Bankruptcy Court's approach to contract interpretation not only is incorrect but it makes no sense because it would effectively override all contract terms specifying the form and amount of payment in determining rights and obligations among the parties to complex interrelated contracts, if any party files for bankruptcy.  Under the Bankruptcy Court's theory, all contracting parties are presumptively on notice that all contract terms are subject to being interpreted differently in the "bankruptcy context."  This view of contract interpretation has been forcefully repudiated by the *Travelers* and *Butner* line of cases.

The Bankruptcy Court erred in stating that DFO's TIAs do not require that all payments thereunder be in cash – *i.e.*, in U.S. dollars – on the grounds that, "Section 7(c) could have required payment in cash, but it does not."  (D-2, Decision, 14)  The payment referred to in Section 7(c) is payment of SLV under the Lease.  Under New York law, all of the interrelated contracts involved in a single transaction must be interpreted as a whole, consistent with the purpose of the transaction.  *Westmoreland Coal Co. v. Entech, Inc.*, 100 N.Y.2d 352, 358 (N.Y. 2003) ("'A written contract will be read as a whole, and every part will be interpreted with reference to the whole; and if possible it will be so interpreted as to give effect to its general purpose.'" (citations omitted)).  Under the Lease, Section 3(d) requires "[a]ll payments pursuant to this Lease shall be made . . . in U.S. dollars and in immediately available funds."  (D-13 Ex.

A, Lease §3(d))  There is nothing ambiguous about this contractual requirement.  Construing the Operative Documents together, the Section 7(c) payment requirement contemplates that payment be made in U.S. dollars and in immediately available funds to satisfy this condition.

**III.    The Bankruptcy Court Erred In Declining To Consider The Uncontroverted Extrinsic Evidence**

The Bankruptcy Court expressly found no ambiguity in Section 7(c) of the TIA.  However, if there was no ambiguity, then the Bankruptcy Court was not permitted to go outside the four corners of the TIAs and other Operative Documents in construing the meaning of Section 7(c).  *Bayerische Hypo-Und Vereinsbank AG v. Banca Nazionale Del Lavoro, S.p.A. (In re Enron Corp.)*, 292 B.R. 752, 762 (Bankr. S.D.N.Y. 2003) ("If the contract language is 'unambiguous,' this Court must enforce the plain, ordinary, and common meaning of those terms as a matter of law without reference to extrinsic evidence."); *New York City Off-Track Betting Corp. v. Safe Factory Outlet, Inc.*, 809 N.Y.S.2d 70, 73 (N.Y. App. Div. 2006) ("'It is a court's task to enforce a clear and complete written agreement according to the plain meaning of its terms, without looking to extrinsic evidence to create ambiguities not present on the face of the document.'").  But that is precisely what it did, as evidenced by the fact that the TIAs and other Operative Documents do not contain any language which even remotely suggests that the parties intended SLV to be, as found by the Bankruptcy Court, (i) a "net" amount derived after taking various deductions (D-40, Second Reconsideration Motion, ¶¶8, 20-25; D-38, Tr. 8/20/07, 58-59), and (ii) an amount which must be further reduced to "bankruptcy dollars" to account for the fact that Delta was in bankruptcy.  (D-40, Second Reconsideration Motion, ¶31)

Either the Bankruptcy Court erred by going outside the four corners of documents if the disputed contract terms were unambiguous or it erred by failing to consider the unrebutted Second Gebler Affidavit and the Menaker Affidavit if the disputed contract terms *were*

ambiguous.  In its Second Reconsideration Motion, DFO pointed out the ambiguities in Section 7(c) that were implicit in the Bankruptcy Court's rulings (D-40, Second Reconsideration Motion, ¶8), but the Bankruptcy Court chose to ignore the uncontroverted extrinsic evidence supplied by the Second Gebler Affidavit and the Menaker Affidavit as to what the parties in fact intended with respect to the meaning of Section 7(c) generally and the meaning of SLV in particular.

*[remainder of page intentionally left blank]*

## CONCLUSION

In this case, a straightforward contract interpretation demonstrates that Delta has failed to establish its entitlement to a Section 7(c) Defense because it was not required to pay full SLV in cash as mandated by the Operative Documents. A distribution of Delta stock worth only 50% of the IT Claim amount, itself far less than SLV, resulting in a substantial shortfall, is not the contractual equivalent. The Bankruptcy Court erred in reading into the contracts a special "bankruptcy context" meaning that would never apply outside of the bankruptcy courtroom. The practical result of this ruling is that instead of receiving plan distributions on account of the allowed DFO Claims to which it is entitled under the Operative Documents, DFO will receive no compensation from Delta for the significant tax Losses it has suffered due to Delta's defaults. This unprecedented nullification of the TIAs is neither permitted by the contracts, nor by United States Supreme Court precedent. Nor is it fair under any standard.

DFO respectfully requests the Court to (i) reverse the Disallowance Order and the Reconsideration Order, direct the Bankruptcy Court to enter an order allowing the DFO Claims as to liability, and remand for determination of their proper amounts, or (ii) alternatively, remand for further evidentiary proceedings and direct the Bankruptcy Court to consider extrinsic evidence with respect to the meaning of the relevant contractual provisions.

Dated:  New York, New York          KAYE SCHOLER LLP
       January 30, 2008

                                   Richard G. Smolev (RS 2222)
                                   Piper A. Brock (PB 6335)
                                   425 Park Avenue
                                   New York, New York 10022
                                   (212) 836-8000 (telephone)
                                   (212) 836-8689 (facsimile)
                                   *Counsel for Appellant*
                                   *DFO Partnership*