**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------x
: 
DFO Partnership, :
:
Appellant, :    **Civil Case No. 07-CV-11437 (RJH)**
:    **(ECF Case)**
-against- :
:
**DELTA AIR LINES, INC. and THE POST-** :
**EFFECTIVE DATE COMMITTEE OF DELTA** :
**AIR LINES, INC.,** :
:
Appellees. :
:
------------------------------------------------------------x


### BRIEF OF APPELLEES DELTA AIR LINES, INC.
### AND THE POST-EFFECTIVE DATE COMMITTEE

DEBEVOISE & PLIMPTON LLP
Michael E. Wiles
919 Third Avenue
New York, New York 10022
Telephone:  (212) 909-6000
Facsimile:  (212) 909-6836


*Attorneys for Delta Air Lines, Inc.*

AKIN GUMP STRAUSS HAUER & FELD LLP
David H. Botter
Drake Foster
590 Madison Avenue
New York, NY 10022
Telephone: (212) 872-1000
Facsimile: (212) 872-1002


*Counsel for the Post-Effective Date Committee*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iii

PRELIMINARY STATEMENT .......................................................................... 1

COUNTER-STATEMENT OF ISSUE PRESENTED .................................... 2

APPLICABLE STANDARD OF APPELLATE REVIEW ........................... 2

STATEMENT OF THE CASE ............................................................................ 2

    A.    The DFO Transactions ........................................................... 2

    B.    TIA/SLV Objection 1 and the Bankruptcy Court's Decision ........................... 3

    C.    TIA/SLV Objection 2 and the Bankruptcy Court's Decision ........................... 4

    D.    Delta's and Northwestern's Motions for Reconsideration ................................ 5

    E.    DFO's Motions for Reconsideration ..................................... 6

ARGUMENT AND ANALYSIS ......................................................................... 8

I.    THE BANKRUPTCY COURT CORRECTLY HELD THAT THE
CONTRACTS EXTINGUISH DFO'S TIA CLAIMS, REGARDLESS OF
WHETHER SLV IS PARTIALLY COLLECTED THROUGH OTHER
RECOVERIES ............................................................................. 8

    A.    DFO's Interpretation Is Contrary To The Plain Language of the
Leases .............................................................................. 8

    B.    DFO's Interpretation Would Deprive Section 7(c) Of Any Meaning
And Would Render It A Nullity ........................................ 10

    C.    DFO's Modified Arguments About Sections 15(c) and 15(e) Are
Contrary To DFO's Prior Contentions And In Any Event Are
Without Merit. ................................................................ 12

II.    The "Net SLV" Claims Calculated Under The Restructuring Agreements
Are Consistent With The Remedy Provisions Under The Lease ............................. 14

III.    The Tax Indemnity Agreements Do Not Require The Payment Of SLV "In
Cash," And Even If They Did Such Provisions Would Be Superseded By
Federal Bankruptcy Law ................................................. 16

i

IV.    THE BANKRUPTCY COURT DID NOT USE A "BANKRUPTCY-SPECIFIC" RULE OF CONTRACT INTERPRETATION ...................................... 18

V.    THE BANKRUPTCY COURT PROPERLY EXCLUDED EXTRINSIC EVIDENCE ................................................................................................ 19

VI.    THE LAW REQUIRES DISALLOWANCE OF DUPLICATIVE CLAIMS TO THE EXTENT OF THE OVERLAP .................................................... 20

CONCLUSION .................................................................................................... 25

# TABLE OF AUTHORITIES

**Page**

## Cases

*805 Third Avenue Co. v. M.W. Realty Associates*,
   448 N.E.2d 445 (N.Y. 1983) ...................................................................................20

*Butner v. United States*,
   440 U.S. 48 (1979) ...................................................................................................18

*Corhill Corp. v. S.D. Plants, Inc.*,
   176 N.E.2d 37 (N.Y. 1961) .....................................................................................12

*Diversified Graphics, Ltd. v. Groves*,
   868 F.2d 293 (8th Cir. 1989)...................................................................................21

*Frank Nero Auto Lease, Inc. v. Townsend*,
   411 N.E.2d 507 (Ohio Ct. App. 1979) ....................................................................14

*Havel v. Kelsey-Hayes Co.*,
   445 N.Y.S.2d 333 (N.Y. App. Div. 1981)...............................................................20

*In re Chateaugay Corp.*,
   115 B.R. 760 (Bankr. S.D.N.Y. 1990), *aff'd*, 130 B.R. 690 (S.D.N.Y. 1991)
   *vacated by agreement*, Nos. 89 Civ. 6012, 90 Civ. 6048, 1993 WL 388809
   (S.D.N.Y. June 16, 1993) .........................................................................................22

*In re Delta Air Lines, Inc.*,
   381 B.R. 57, 2008 Bankr. LEXIS 130 (Bankr. S.D.N.Y. 2008) ..............................16

*In re Enron Corp.*,
   364 B.R. 482 (S.D.N.Y. 2007) ..................................................................................2

*In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey*,
   160 B.R. 882 (Bankr. S.D.N.Y. 1993) .............................................................. 21-22

*In re Fobian*,
   951 F.2d 1149 (9th Cir. 1991)..................................................................................18

*In re Simetco, Inc.*,
   No. 93-61772, 1996 WL 651001 (Bankr. N.D. Ohio Feb. 15, 1996) .......................22

*In re T.R. Acquisition Corp.*,
    309 B.R. 830 (S.D.N.Y. 2003) ................................................................22

*In the Matter of Brinke Transportation., Inc.*,
    No. 87-03785, 1989 WL 233147 (Bankr. D.N.J. Jan. 23, 1989) ..............22

*Kates v. Yeshiva University,*
    227 N.Y.S.2d 718 (N.Y. Sup. Ct. 1962) ................................................20

*Raleigh v. Illinois  Department of Revenue*,
    530 U.S. 15 (2000) ............................................................................ 18-19

*Schmidt v. Magnetic Head Corp.*,
    468 N.Y.S.2d 649 (N.Y. App. Div. 1983)..............................................20

*Siletz Trucking Co. v. Alaska Int'l Trading Co.*,
    467 F.2d 961 (9th Cir. 1972)..................................................................14

*Southwest Park Outpatient Surgery, Ltd. v. Chandler Leasing Division*,
    572 S.W.2d 53 (Tex. Civ. App. 1978) ...................................................14

*Travelers Casualty & Surety. Co. of America v. Pacific Gas & Elec. Co.*,
    127 S. Ct. 1199 (2007) ................................................................5, 18, 19

*Two Guys from Harrison-N.Y., Inc. v. S.F.R. Realty Associates*,
    472 N.E.2d 315 (N.Y. 1984) ..................................................................12

*Zion v. Kurtz,*
    405 N.E.2d 681 (N.Y.1980) ...................................................................20

## Statutes and Rules

11 U.S.C. § 101(5) (2007) .............................................................................21, 23

11 U.S.C. § 502 (2007) .................................................................................19, 23

FED. R. BANKR. P. 8013 ...................................................................................2

## Other

BLACK'S LAW DICTIONARY 1165 (8th ed. 2004) ..........................................16

Appellees Delta Air Lines, Inc. ("**Delta**") and the Post Effective Date Committee (the "**Committee**") submit this brief in response to the appeal by DFO Partnership ("**DFO**") from the September 20, 2007 "Order with Respect to TIA/SLV Objection 1" (the "**Order**") [D 3] and the November 15, 2007 "Order Denying Motion for Reconsideration of Order with Respect to TIA/SLV Objection 1" (the "**Reconsideration Order**") [D 4], each entered by the Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**").[1]

## PRELIMINARY STATEMENT

This appeal arises out of tax-driven "leveraged lease" financings for eight aircraft. DFO established trusts to own aircraft (the "**Owner Trusts**"), and the Owner Trusts borrowed funds to assist in financing the purchase of the aircraft. Delta then entered into leases ("**Leases**") with the Owner Trusts, and the Owner Trusts assigned the Leases, as collateral, to indenture trustees ("**Indenture Trustees**") who acted for the lenders. In the event of a default, the Leases entitled the Owner Trusts (or the Indenture Trustees as assignees) to various remedies, including the recovery of liquidated damages or "Stipulated Loss Value" ("**SLV**").

Delta also entered into tax indemnity agreements ("**TIAs**") in which Delta agreed to indemnify DFO against certain tax losses. DFO acknowledged that the computation of SLV already included the amount needed to compensate DFO for tax losses that DFO might suffer upon a default under the Leases. The TIAs addressed this potential duplication by barring indemnification if DFO's tax loss arose out of "any event" whereby Delta is "required to pay" SLV. *See, e.g.,* TIA for N914DL (Gebler Aff. Ex**.** B [D-13]), § 7(c).

DFO asserted claims in Delta's chapter 11 case, arguing that Delta had defaulted under the Leases and that DFO would incur tax losses when remedies were exercised. The Bankruptcy

---

[1]  The notation "**D**" refers to Appellant's Designation of Record and the notation "**CD**" refers to Appellees' Counter-Designation of Items for Inclusion in Record on Appeal.

Court correctly held that Delta was "required to pay" SLV in connection with those Lease defaults and that DFO's claims therefore were barred by the plain language of the TIAs.

In its Brief on Appeal ("**DFO Br.**"), DFO has thoroughly mischaracterized the Bankruptcy Court's rulings. The Bankruptcy Court's decisions were based on the plain language of the contracts and should be affirmed. The Bankruptcy Court's Orders also should be affirmed for the alternative reasons set forth in Part VI of this Brief.

## COUNTER-STATEMENT OF ISSUE PRESENTED

Whether DFO's TIA Claims were barred by the terms of the TIAs.

## APPLICABLE STANDARD OF APPELLATE REVIEW

Factual findings are reviewed for clear error, and conclusions of law are reviewed *de novo*. FED. R. BANKR. P. 8013; *In re Enron Corp.*, 364 B.R. 482, 485 (S.D.N.Y. 2007).

## STATEMENT OF THE CASE

DFO's contentions have changed since Delta and the Committee filed their objection to DFO's claims ("**TIA/SLV Obj. 1**") [D 7], and DFO's arguments on appeal contradict some of the arguments that DFO made to the Bankruptcy Court. It is important to review just what DFO argued in response to TIA/SLV Obj. 1 and what the Bankruptcy Court held.

A.    **The DFO Transactions**

In 1988 and 1990, Delta entered into eight leveraged lease transactions with DFO as owner participant, covering eight McDonnell Douglas MD-88 aircraft. *See* TIA/SLV Obj. 1 at 3-9; Decision on TIA/SLV Objections 1 and 2 (the "**Decision**") at 3-4 [D 2]. The leveraged lease transactions provided significant tax benefits to DFO: the Owner Trusts that DFO established are "grantor trusts" whose existence is ignored for tax purposes, so that accelerated depreciation and other tax deductions could be used by DFO.

Section 15 of each of the DFO Leases describes certain non-exclusive remedies that could be exercised upon a default. Those provisions required Delta to pay SLV in the event of a default, with credits to be applied for any proceeds that were obtained by the Lessor (or the Indenture Trustee) from a sale or re-leasing of the aircraft. The DFO Leases included tables that specified the SLVs for the aircraft, which differed depending on the date on which a default occurred. *See, e.g.,* Lease for N914DL § 15 and Exhibit B thereto (Gebler Aff. Ex. A).

Delta also entered into eight TIAs with DFO, the terms of which are identical insofar as they are relevant to this appeal. In each TIA, Delta agreed to indemnify DFO if, "as the result of" any "act or omission" by Delta, DFO were to "recapture" certain depreciation deductions or incur other tax losses. *See, e.g.,* TIA for N914DL (Gebler Aff. Ex**.** B), § 6(a). However, Section 7 of each TIA also contained a number of exclusions, one of which (Section 7(c)) states that DFO is not entitled to indemnification if its tax "Loss" arises as a result of "any event" whereby Delta is "required to pay Stipulated Loss Value . . ." *Id.* at § 7(c).

**B.**    **TIA/SLV Objection 1 and the Bankruptcy Court's Decision**

On August 16, 2006**,** DFO filed eight Proofs of Claim (the "**DFO Claims**") in Delta's chapter 11 case, alleging that Delta had defaulted under the Leases and that DFO would incur tax losses when the Indenture Trustee exercised remedies. Delta and the Official Committee of Unsecured Creditors (the predecessor of the Committee) filed an objection to DFO's claims that was designated as "TIA/SLV Objection 1." Delta and the Committee argued that DFO's claims were duplicative of SLV claims and could not be allowed. They also argued that Section 7(c) of each TIA made clear DFO's TIA claims had to be expunged. *See TIA/SLV Obj. 1 at 15.*

DFO responded on March 1, 2007 (the "**DFO Response**") [D 9]. DFO acknowledged that the calculation of SLV included various "components," including the amount needed to

3

compensate DFO for tax losses it might incur upon a default. *See* DFO Response at 9-10. DFO contended, however, that its TIA claims should be allowed.

DFO's primary argument was that the "duplication" between TIA Claims and SLV Claims had been "eliminated" because DFO allegedly had not pledged the "tax component" of SLV to the Indenture Trustees. *Id.* at 10-12. The Bankruptcy Court disagreed, holding that "the entirety of SLV, including the tax component and the owner participant's equity component, constitutes collateral security for the indebtedness owed to the lenders." Decision at 10-11. DFO has since abandoned this argument.

DFO also argued that Section 7(c) of the TIAs only applies if there is an "Event of Loss" caused by destruction of the aircraft. *See* DFO Response at 15-20. DFO explained that the remedies in Section 15 of the Leases all require that SLV be "offset" by other recoveries, and that Section 7(c) should only apply if Delta is required to pay SLV without offsets. *Id.* Delta and the Committee replied that DFO's arguments contradicted the terms of the Leases and would render Section 7(c) meaningless. *See* Reply at 9-14 [D 25]; *see also* Part I, below. The Bankruptcy Court agreed and held that DFO's claims should be disallowed. Decision at 10.[2]

C.    **TIA/SLV Objection 2 and the Bankruptcy Court's Decision**

In the Decision, the Bankruptcy Court also ruled on a separate objection ("**TIA/SLV Obj. 2**") to TIA claims by Northwestern Mutual Life Insurance Company ("**Northwestern**"). The TIAs in that case barred a TIA claim if Delta "pays" SLV or "an amount determined by reference thereto." Decision at 13. Northwestern argued that its TIA exclusion should not apply unless Delta paid Stipulated Loss Value in full and in cash. *Id.* The Bankruptcy Court rejected

---

[2]    The Bankruptcy Court also rejected the argument that two claims cannot be allowed for the same loss. Decision at 6-8. Delta and the Committee disagree and submit that this is an alternative ground for affirmance of the Orders disallowing the claims. *See* Part VI, below.

this contention, pointing out that the TIA did not include that language.  The Bankruptcy Court also noted that bankruptcy was one of the events (if not the main event) that triggered the obligation to pay SLV, so that the parties must have contemplated the possibility that SLV claims would be "paid" only in such manner as the bankruptcy plan, and the Bankruptcy Code, permitted.  *Id.* at 10, 12-14.

Northwestern also argued that it should retain its TIA claim for one aircraft that was subject to a settlement term sheet referred to as the "**Bingham Term Sheet**."  The Bankruptcy Court agreed, holding that the Bingham Term Sheet did not refer to SLV.  Decision at 15.

**D.      Delta's and Northwestern's Motions for Reconsideration**

Delta and the Committee moved for reconsideration of the Decision with respect to TIA/SLV Objection 2, pointing out that the Bingham Term Sheet explicitly referred to SLV, and asking that the Court reverse its ruling on that issue.  *See* Motion [D 33] at 3-4.  Northwestern also moved for reconsideration, reiterating its argument that the TIA exclusion applied only if SLV were paid "in cash" and in full.  It also contended that the Bankruptcy Court had used a "bankruptcy specific" interpretation of the contracts in violation of *Travelers Casualty & Surety Co. of America. v. Pacific Gas & Electric Co.*, 127 S. Ct. 1199 (2007).

The Bankruptcy Court addressed Delta's and Northwestern's motions in a hearing on July 10, 2007 (the "**July 10 Hearing**") [CD 3].  The Bankruptcy Court granted Delta's motion, acknowledging that the Bingham Term Sheet explicitly required a payment that was "predicated on a calculation based on SLV."  July 10 Hearing Tr. at 8.  The Bankruptcy Court then rejected Northwestern's contention that the TIA required payment of SLV "in cash and in full," holding that the TIAs contained no such language.  Finally, the Bankruptcy Court explained that its interpretation of the contracts was based entirely on state law rules of interpretation and complied with *Travelers*:

What I said was, or meant to convey in my opinion, was that when the parties use the phrase in Paragraph 6(c), refer to an event whereby the lessee pays stipulated loss value or an amount determined by reference thereto, the parties must have had, in their contemplation, understanding and, therefore, their intent, the self-evident postulate that stipulated loss value might be required to be paid, or an amount determined by reference to stipulated loss value might be required to be paid in the context of bankruptcy.  And in that context, it would be perfectly clear to anybody familiar with bankruptcy and presumably, the lawyers and principals who were responsible for this agreement, that the concept of payment in bankruptcy must contemplate the possibility, indeed, the nearly certain probability, that the payment would not be dollar-for-dollar in cash.

In so ruling, I was not making a ruling that bankruptcy law supervened to govern the terms of this agreement that we're concerned with, Section 6(c). Rather, my point was that in construing what the parties contemplated and, therefore, intended in writing Section 6(c) as they did, they must have contemplated the possibility, if not the likelihood, of an obligation to pay SLV in the context of bankruptcy, in which context it would almost certainly be impossible to pay in full, in cash.

*Id*. at 12-13.

**E.     DFO's Motions for Reconsideration**

DFO also filed a motion for reconsideration (the "**First DFO Motion**") [D 32].  In a footnote, DFO adopted the arguments made by Northwestern.  *See* First DFO Motion at 2 n. 2. DFO also contended that the manner in which SLV claims had been calculated was "not allowed" by the Leases.  *See id.* at 6.  Finally, DFO argued that Section 7(c) was "plain" and "unambiguous" and that DFO's claims should be allowed unless SLV were paid in cash and without offsets for other recoveries.  *Id.* at 8-10.

The Bankruptcy Court held a hearing on August 20, 2007 to consider DFO's motion (the "**August 20 Hearing**").  During that hearing, Delta's counsel reviewed the terms of the contracts in detail and argued that DFO's arguments were contrary to the plain language of the agreements.  *See* August 20 Hearing Tr. [D 38] at 41-44.  The Bankruptcy Court agreed,  *id*. at 64, and on September 20, 2007 it entered the Order disallowing DFO's claims.

DFO then reversed course, submitting new arguments in a second motion for reconsideration (the "**Second DFO Motion**") [D 40]. Although DFO had previously contended that Section 7(c) was unambiguous, DFO now urged the Bankruptcy Court to consider affidavits by DFO representatives, stating that in their personal opinions Section 7(c) should only apply if SLV were paid without offsets. Second DFO Motion ¶¶ 9-11, 23. DFO also argued that Sections 15(c) and 15(e) of the Lease require Delta to pay SLV without offsets. *Id.* ¶¶ 14-17.

Delta and the Committee responded that that the Bankruptcy Court relied on the plain language of the contracts and found no ambiguity. *See* Response [D 43] at 3. They also argued that DFO's argument about Sections 15(c) and 15(e) of the Leases was without merit and was contrary to DFO's prior arguments about those same provisions. *Id.* at 4-5, 8-10.

The Bankruptcy Court held a hearing to consider the Second DFO Motion on November 6, 2007 (the "**November 6 Hearing**"). During that hearing, DFO's counsel acknowledged that under the Leases "the lessor or the indenture trustee as its assignee sometimes receives SLV through a combination of payments by the lessee and recovery from other sources, such as the sale of the aircraft." November 6 Hearing Tr. [D 46] at 4. With respect to the remedy provisions of the Leases, the Bankruptcy Court and DFO's counsel had this exchange:

> THE COURT: Okay. So your position basically is you acknowledge that SLV can be recovered by the indenture trustee from two sources, in effect: Value, whether it's value of the aircraft in terms of sale value or fair market value; i.e., the value of the aircraft, combined with a cash payment of SLV or a claim payment of SLV by Delta, right?
>
> MR. SMOLEV: Yes, I agree with that. I agree with that proposition.

*Id.* at 29-30. The Bankruptcy Court observed that it did not make sense for DFO to contend that the agreements intended for SLV to be "recovered" through sales proceeds and other sums (and that these recoveries reduced Delta's payment obligations), while at the same time contending

that sale proceeds and other recoveries did not count as a "payment" of SLV. *Id.* at 31. At the

conclusion of the hearing, the Bankruptcy Court rejected the Second DFO Motion. *Id.* at 66-67.

The Reconsideration Order was entered on November 15, 2007, and DFO filed a timely appeal.

## ARGUMENT AND ANALYSIS

Section 7(c) of each TIA applies if Delta is "required to pay" SLV – that is, if Delta has a

legal obligation to do so. Here, Delta was "required to pay" SLV, and that is why the Indenture

Trustees were entitled to assert SLV claims in Delta's bankruptcy case. DFO's duplicative TIA

Claims are barred, and DFO's arguments to the contrary lack merit.

## I.   THE BANKRUPTCY COURT CORRECTLY HELD THAT THE CONTRACTS EXTINGUISH DFO'S TIA CLAIMS, REGARDLESS OF WHETHER SLV IS PARTIALLY COLLECTED THROUGH OTHER RECOVERIES

In each of the transactions that is the subject of this Objection, the TIA provides that

DFO has no tax indemnity claim in "any event" where "any party" to any of the Operative

Documents is "required to pay Stipulated Loss Value or Termination Value." *See* § 7(c) of each

TIA (*e.g.*, Gebler Aff. Ex. B). In DFO's view, Section 7(c) of the TIA does not apply unless the

Lessee is required to pay SLV with no credit or offset for other recoveries or payments. DFO Br.

at 14-15. DFO's argument is contrary to the plain language of the parties' contracts and to

ordinary and well-settled rules of contract interpretation.

### A.   DFO's Interpretation Is Contrary To The Plain Language of the Leases

DFO argues that the "default" provisions in Section 15 of the Lease do not "require

payment" of SLV, because the Lessee's payment obligation is offset by fair market value, sales

proceeds or other recoveries. However, the Lease itself equates the payment of such "offsetted"

amounts with the "actual payment" of Stipulated Loss Value.

Section 15(c) of each Lease provides, for example, that the Lessor may demand payment

of the following:

> . . . any installment of Basic Rent with respect to the Aircraft . . . plus an amount equal to the excess, if any, of (i) the Stipulated Loss Value for the Aircraft computed as of the date specified in Exhibit B hereto . . . over (ii) the Fair Market Value for the Aircraft . . . <u>and together with such excess, interest, to the extent permitted by applicable law, at the Past Due Rate on the amount of such Stipulated Loss Value, from the date as of which such Stipulated Loss Value is computed to the date of actual payment of such amount;</u>

Lease, § 15(c) (emphasis added) (Gebler Aff. Ex. A).

The Lease itself thereby treats the computation and payment of an "offsetted" amount as the "actual payment" of Stipulated Loss Value. The interest accrual runs "from the date as of which *such Stipulated Loss Value* is computed to the date of actual payment of *such amount*." The words "such amount" plainly refer to "Stipulated Loss Value." The only payment that is called for in Section 15(c) is the "net" amount that is due after SLV is adjusted to take account of the fair market value of the Aircraft. Accordingly, the Lease equates the payment of the offsetted amount with the payment of SLV. If DFO's contrary argument were correct – and if the "payment" of SLV required a payment without offsets – then the foregoing interest computation could not be made, because there never would be an "actual payment" of SLV.

Section 15(d) of the Lease provides that if the Lessor sells the Aircraft, a similar amount is due, but with the "sale proceeds" (rather than fair market value) applied as an offset:

> . . . an amount equal to the excess, if any, of (i) the Stipulated Loss Value for the Aircraft . . . over (ii) the net proceeds of such sale (after deduction of all expenses of such sale), <u>and, together with such excess, interest, to the extent permitted by applicable law, at the Past Due Rate on the amount of such Stipulated Loss Value, from the date as of which such Stipulated Loss Value is computed to the date of actual payment;</u>

Lease, § 15(d) (emphasis added) (Gebler Aff. Ex. A). Section 15(d) again confirms that the Lessee's "net" payment, coupled with sale proceeds, constitutes the "actual payment" of SLV.

Section 15 of the Lease treats the actual payment of a "net" amount as the payment of Stipulated Loss Value. As Delta's counsel argued on August 20, 2007:

> Stipulated loss value, what it is, is a guaranteed minimum recovery. As long
> as you have the fair market value of the aircraft and the difference paid for,
> you have recovered and been paid stipulated loss value. That's how the lease
> works.

*See* August 20 Hearing Tr. at 43. DFO's counsel acknowledged this very point during the

hearing on November 6, 2007. *See* pages 7-8, above.

### B. DFO's Interpretation Would Deprive Section 7(c) Of Any Meaning And Would Render It A Nullity

DFO argues that the Lessee is not "required to pay" SLV or Termination Value unless the

Lessee actually pays that amount with no offset for other payments or recoveries. If Section 7(c)

were interpreted in the manner that DFO suggests, however, it would have no meaning.

Section 7(c) of the Indemnity Agreement provides, for example, that there is no tax

indemnity claim in any event where the Lessee is required to pay "Termination Value." *See*

TIA, § 7(c) (Gebler Aff. Ex. B). There is only one situation in which "Termination Value" is

paid under the Lease: namely, in the event of an optional termination due to the obsolescence of

the aircraft. *See* Lease, § 9 (Gebler Aff. Ex. A); *see also* DFO Response at 9. Section 9 of the

Lease provides that in that event the Aircraft should be sold, and the Lessee "shall pay to Lessor

. . . the amount, if any, by which the Termination Value . . . exceeds the sales price received by

Lessor" from the sale of the aircraft. *See* Lease, § 9 (emphasis added) (Gebler Aff. Ex. A).

Under DFO's reasoning, the requirement in Section 9 of the Lease would not trigger the

exclusion of Section 7(c) because Section 9 requires the Lessee to pay only the excess of

Termination Value over the sales price. Such an interpretation, however, would deprive Section

7(c) of any meaning insofar as it relates to Termination Value, because Section 9 of the Lease is

the only circumstance under which the "Termination Value" concept is invoked.

The same is true regarding the reference to "Stipulated Loss Value." DFO argued that

none of the remedy provisions in Section 15 of the Lease required payment of SLV because they

all required offsets for other recoveries.  DFO recognized that its interpretation of Section 7(c) would make no sense unless DFO could identify a circumstance under which a party must pay SLV without any offset, and DFO attempted to use the provisions relating to an "Event of Loss" to fill that void.  *See* DFO Br. at 14; Second DFO Motion at ¶¶ 13-9.  However, DFO's argument was contrary to what the Lease provides.  Section 11 of the Lease requires the Lessee to maintain insurance; if an Event of Loss occurs, the insurance proceeds are paid directly to the Owner Participant (or, by virtue of the Indenture, to the Indenture Trustee).  The Lease states that these insurance proceeds are then "<u>applied in reduction</u> of Lessee's obligation to pay . . . Stipulated Loss Value" with respect to the Aircraft.  *See* Lease, § 11(a) (emphasis added) (Gebler Aff. Ex. A).  Therefore, even if an Event of Loss occurs, the Lessee's obligation to pay SLV is offset by a payment from another source.

In every instance in which the Lease refers to "Stipulated Loss Value" and "Termination Value" – whether in the Default provisions, the Event of Loss provisions, the early termination provisions, or otherwise – the Lease provides that the Lessee's obligation to pay SLV or Termination Value is to be offset by other recoveries and payments, either in the form of sale proceeds, fair market value, insurance proceeds or governmental payments.  Thus:

- If a default occurs, the Lessor may elect to recover the difference between SLV and the fair market value or actual sale proceeds.  *See* Lease, § 15 (Gebler Aff. Ex. A).

- If payments are received from governmental authorities, Section 10 of the Lease provides that such payments "shall be paid to the Indenture Trustee in reduction of Lessee's obligation to pay [SLV]" or, "if [SLV is] already paid by Lessee, shall . . . be applied to reimburse Lessee for its payment of such Stipulated Loss Value."  *See* Lease, § 10(c)(i) (Gebler Aff. Ex. A).

- If an Event of Loss occurs, as noted above, insurance proceeds are applied "in reduction" of Lessee's obligation to pay SLV. *See* Lease, § 11 (Gebler Aff. Ex. A).

- If a Termination Event occurs, the Lessee must pay the "excess" of Termination Value over the sale proceeds. Lease, § 9 (Gebler Aff. Ex. A).

If DFO were correct – and if the presence of an "offset" meant that the Lessee is not "required to pay" Stipulated Loss Value or Termination Value – then Section 7(c) would have no meaning at all. No contract should be interpreted in a manner that renders any of its provisions meaningless. *See Two Guys from Harrison-N.Y., Inc. v. S.F.R. Realty Assocs.*, 472 N.E.2d 315, 318 (N.Y. 1984) ("In construing a contract, one of a court's goals is to avoid an interpretation that would leave contractual clauses meaningless.") (citations omitted); *Corhill Corp. v. S.D. Plants, Inc.*, 176 N.E.2d 37, 38 (N.Y. 1961) ("It is a cardinal rule of construction that a court should not adopt an interpretation which will operate to leave a provision of a contract . . . without force and effect.") (internal quotations and citations omitted).

### C.    DFO's Modified Arguments About Sections 15(c) and 15(e) Are Contrary To DFO's Prior Contentions And In Any Event Are Without Merit

In the Second DFO Motion, and in its brief on appeal, DFO has argued that Sections 15(c) and 15(e) of the Leases require the payment of SLV without offset for other recoveries, and that the TIA exclusion only applies in these circumstances. That argument was not a proper ground for a motion for reconsideration and it is not a proper issue on appeal, because it is directly contrary to the position that DFO actually argued in response to TIA/SLV Objection 1.

DFO contended in response to TIA/SLV Objection 1 that the <u>only</u> circumstance in which Section 7(c) applies is if an "Event of Loss" occurs under Section 10 of the Lease. *See* DFO Response at 15-16. As to Section 15(e), DFO argued to the Bankruptcy Court that:

> In fact, although Section 15(e) of the Lease at first appears to require payment of SLV, an examination of the entire provision reveals that such payment triggers a sale of the Aircraft by the Indenture Trustee **and** a return of the net proceeds of sale to the Debtor.  Hence the Debtor is not really "required to pay" under this provision at all . . . .

*Id.* at 19.  Similarly, DFO argued that Section 15(c) requires that "the Debtor pay the excess of SLV over the Fair Market Value of the Aircraft *(as determined through negotiation with the Debtor or an appraisal process)* . . . ."  *Id.* at 17 (emphasis added).  DFO made these arguments as part of its contention that "there is no provision in the remedies section of the Lease under which Delta is 'required to pay' SLV."  *Id*. at 16, 19.

In any event, DFO's new interpretation of the Lease is simply wrong.  Section 15(e) plainly requires a return of sale proceeds, as DFO acknowledged in its initial filing.  Section 15(c) also requires an offset for "fair market value."  The exception that DFO has belatedly seized upon – *i.e.*, the statement that fair market value is zero if the lessor cannot obtain "possession" of the aircraft – addresses the narrow possibility that a Lessor might not be able to repossess and exert control over the underlying aircraft because, for example, the aircraft might have been moved to a foreign jurisdiction.  Fair Market Value is deemed to be "zero" in that limited circumstance because, if the Lessor has no access to the Aircraft, the Lessor has no ability to turn the hypothetical fair market value into a real recovery.

In this case, the Restructuring Agreements required the rejection of the Leases.  The Lessors (or their assignees) elected to enter into new leases with Delta, but they had full control and legal possession of the relevant Aircraft and the ability to take whatever steps they thought would realize the market values thereof, and they have actually realized such values.

The Indenture Trustees have never disputed their "possession" of the collateral and have never disputed the propriety of the "offsets" to SLV claims that were set forth in the Bingham

Term Sheet and other term sheets.  In fact, it has long been well-established that a lessor *must* treat the proceeds of re-leasing or of sale as credits against liquidated damages, because otherwise the liquidated damage provisions would operate as unenforceable penalties.  *See Frank Nero Auto Lease, Inc. v. Townsend*, 411 N.E.2d 507, 510-11 (Ohio Ct. App. 1979) (failure to provide credit for proceeds from new lease rendered damage provision an unenforceable penalty); *Sw. Park Outpatient Surgery, Ltd. v. Chandler Leasing Div.,* 572 S.W.2d 53, 56-57 (Tex. Civ. App. 1978) (failure to provide a credit for proceeds of a sale or re-leasing would be an unenforceable penalty); *Siletz Trucking Co. v. Alaska Int'l Trading Co.*, 467 F.2d 961, 963 (9th Cir. 1972) (credit for proceeds, and discounting of future revenues to present value, are necessary to prevent damage calculation from constituting an unenforceable penalty).  In this respect, the term sheets merely recognize offsets that the law requires.

II.   **The "Net SLV" Claims Calculated Under The Restructuring Agreements Are Consistent With The Remedy Provisions Under The Lease**

DFO argues that the calculation of the Indenture Trustees' claims under the Bingham Term Sheet and other term sheets allegedly did not comply with the Leases.  The import of this argument is not clear, as the Bankruptcy Court noted in referring to the argument as "unintelligible."  Decision at 12.  In any event, DFO is wrong.

The Lease, and the governing law, require that SLV be adjusted to account for other recoveries obtained by the Lessor.  For example, Section 15(c) of the Lease provides that if a default occurs, the Lessor may seek (i) SLV, plus (ii) unpaid rent, <u>minus</u> (iii) the fair market value of the aircraft. Section 15(d) and 15(e) of the Lease similarly provide that  sales proceeds must be deducted from SLV.

The calculations set forth in the Bingham Term Sheet and in the other Restructuring Agreements take the same approach: they take account of (1) SLV, (2) unpaid rents, and (3) the

value of other recoveries that the lessor/indenture trustee will receive.  The "value" of those other recoveries is represented by the sum of (a) the present value of the rents that the Lessor will receive under a new lease, plus (b) the present value of the expected sale proceeds that the Lessor will receive at the end of the lease term.  The Indenture Trustees, who own the relevant claims, agree that these offsets are appropriate.

In fact, DFO itself argued that one of the "components" of SLV was the expected residual value of the aircraft at the time of a default.  *See* DFO Response at 4-5.  The "offsets" that were recognized in the Bingham Term Sheet merely reflected the fact that some of that value was actually being recovered.  Those offsets had to be made to prevent the SLV computation from constituting an unenforceable penalty.  *See* cases cited in Part I(C), above.

DFO argues that the offsets do not strictly fall under the specific categories enumerated in sub-paragraphs (a) through (e) of Section 15 of the Leases, because those sub-sections only refer to offsets for "fair market value" or "sales proceeds."  However, the sums calculated in accordance with the Bingham Term Sheet and the Restructuring Agreements *do* represent a computation of "fair market value," which consists of (a) the present value of the new lease payments, and (b) the present value of the future sale proceeds.

Furthermore, the remedies available to the Lessor are not limited to Sections 15(a) through 15(e).  Section 15(f) of each Lease states that the Lessor may "exercise any other right or remedy which may be available under applicable law . . . ."  *See* Lease, § 15(f) (Gebler Aff. Ex. A).  The concluding paragraph of Section 15 of each DFO Lease also states:

> Except as otherwise expressly provided above, no remedy referred to in this Section 15 is intended to be exclusive, but each shall be cumulative and in addition to any other remedy referred to above or otherwise available to Lessor at law or in equity; and the exercise or beginning of exercise by Lessor of any one or more of such remedies shall not preclude the simultaneous or later exercise by Lessor of any or all such other remedies.

15

Lease § 15 (Gebler Aff. Ex. A).

Paragraphs 15(c) and 15(e) therefore are not exclusive remedies. Instead, they just illustrate the types of offsets that are contemplated under the Lease with respect to payment of SLV, and that are required under applicable law. The Bankruptcy Court correctly held that "what the Bingham term sheet provided for was substantially, if not completely identical, or substantially the same – materially the same as the SLV relief provided for in Section 15 of the Lease." *See* August 20 Hearing Tr. at 40.

### III. The Tax Indemnity Agreements Do Not Require The Payment Of SLV "In Cash," And Even If They Did Such Provisions Would Be Superseded By Federal Bankruptcy Law

DFO argues that Section 7(c) of the tax indemnity agreements does not apply unless SLV is actually paid in full and "in cash." However, the words "actually pay SLV in full and in cash" do not appear in Section 7(c). DFO's effort to add such requirements to Section 7(c) is contrary not only to the plain language of the contracts, but also to federal bankruptcy law and policy.

The concept of "payment" does not require payment "in cash." Black's Law Dictionary defines "payment" as the "performance of an obligation by the delivery of money or some other valuable thing accepted in partial or full discharge of the obligation." BLACK'S LAW DICTIONARY 1165 (8th ed. 2004). Cash is one way to discharge an obligation, but it is not the only way. *See In re Delta Air Lines, Inc.*, 381 B.R. 57, 2008 Bankr. LEXIS 130 at *21-*26 (Bankr. S.D.N.Y. 2008).

The agreements that govern the DFO transactions contemplate many circumstances in which the obligation to pay SLV may be satisfied other than through payments of cash. Section 15(c) of each Lease, for example, provides that the "Fair Market Value" of the Aircraft is to be treated as partial satisfaction of the obligation to pay SLV, regardless of whether a sale occurs. *See* Lease § 15(c) (Gebler Aff. Ex. A). If the Fair Market Value of an Aircraft equals or exceeds

16

the amount specified in the stipulated loss value table attached to the Lease, then the SLV

obligation is fully satisfied, without any payment of cash at all.

      Section 15(d) of the Lease similarly treats "sale proceeds" as payments towards the

Lessee's SLV obligation.  The Indentures explicitly state that such sale proceeds may include

forms of property other than "cash" payments:

> If an Indenture Event of Default shall have occurred and be continuing and
> the Indenture Trustee shall be entitled to exercise remedies hereunder, and
> subject to Article VIII hereof, the Indenture Trustee, either with or without
> taking possession, and either before or after taking possession, and without
> instituting any legal proceedings whatsoever, may sell, assign, transfer and
> deliver the whole or, from time to time, to the extent permitted by law, any
> part of the Indenture Estate, or any part thereof, or interest therein, at public
> auction, with or without demand, advertisement or notice, except as expressly
> provided for below in this Section 7.03(c), ***for cash or credit or for other
> property***, for immediate or future delivery, and for such price or prices and on
> such terms as the Indenture Trustee in its sole discretion may determine . . . .

Indenture, § 7.03(c) (Gebler Aff. Ex. D) (emphasis added).

      DFO argues that Section 3(d) of each of the Leases requires payments in cash.  However,

DFO's claims arise under the tax indemnity agreements, not the Leases, and DFO has not cited

to a single provision in the tax indemnity agreements that requires a cash payment of SLV to be

made to the indenture trustee.

      DFO also points to provisions in each TIA that require a full payment, in cash, of

*indemnities* that are owed under the TIA.  However, these provisions just illustrate that the

parties knew how to refer to payment "in full and in cash" when that is what they intended.

Section 7(c) contains no such requirement; it prevents duplicative claims by barring a TIA claim

whenever Delta is "required to pay" SLV.

      Finally, federal bankruptcy law permits a debtor to satisfy obligations in the manner set

forth in a confirmed plan of reorganization, including through the payment of stock, and that is

true regardless of whether "cash" payments are specified in a contract.  A creditor's contractual

rights against a debtor in bankruptcy are "subject to any qualifying or contrary provisions of the Bankruptcy Code." *See Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 127 S. Ct. 1199, 1204-05 (2007) (quoting *Raleigh v. Ill Dep't of Revenue*, 530 U.S. 15, 20 (2000) (internal quotations omitted). To the extent that the Bankruptcy Code enforces a "federal interest [that] requires a different result" from what might occur outside bankruptcy, the Bankruptcy Code takes priority. *See Raleigh*, 530 U.S. at 20 (quoting *Butner v. United States*, 440 U.S. 48, 55 (1979)) (internal quotations omitted). The Indenture Trustees cannot (and do not) complain that they will receive distributions of stock rather than payments in cash with respect to their SLV claims, and DFO similarly cannot insist that a "cash" payment of SLV is required.

## IV.   THE BANKRUPTCY COURT DID NOT USE A "BANKRUPTCY-SPECIFIC" RULE OF CONTRACT INTERPRETATION

DFO grossly mischaracterizes the Bankruptcy Court's rulings by contending, on appeal, that the Bankruptcy Court used a "special bankruptcy rule of contract interpretation." DFO Br. at 17-22. The Bankruptcy Court's contract interpretation was based on accepted contract law principles and was fully consistent with the *Travelers* decision.

In *Travelers*, the issuer of a surety bond filed a claim to recover attorneys fees that were recoverable under the plain language of a contract. The debtor objected, arguing that attorneys' fees should not be awarded for time spent litigating "bankruptcy" issues based on policies set forth by the Ninth Circuit in its decision in *In re Fobian*, 951 F.2d 1149 (9th Cir. 1991). *See Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 127 S. Ct. 1199, 1203 (2007). The bankruptcy court rejected Travelers' claim on that basis, and the District Court and the Ninth Circuit affirmed. *Id.* The Supreme Court reversed.

The Supreme Court agreed, in *Travelers*, that state law contract rights are "subject to any qualifying or contrary provisions of the Bankruptcy Code." *Id.* at 1204-05 (quoting *Raleigh v. Ill.*

18

*Dep't of Revenue*, 530 U.S. 15, 20 (2000) (internal quotations omitted). The Court noted, however, that the "Fobian rule" had no textual support in the Bankruptcy Code. As a result, the attorneys' fee claims were not subject to any "contrary provisions" of the Bankruptcy Code, and disallowance could only occur if the claims were barred under state law. *Travelers*, 127 S.Ct at 1204-07; *see also* 11 U.S.C. § 502(b) (2007).

The Bankruptcy Court correctly observed that its ruling was based on New York law and did not offend *Travelers*. *See* July 10 Hearing Tr. at 12-13. Furthermore, the circumstances of this case are unlike those that the Supreme Court addressed in *Travelers*, where the Bankruptcy Court attempted to override a contractual right to collect attorneys' fees without support in the Bankruptcy Code itself. In this case, the Bankruptcy Code permits Delta to satisfy obligations in the manner set forth in its confirmed plan of reorganization, regardless of whether "cash" payments are specified in a contract. Since the Bankruptcy Code enforces a "federal interest [that] requires a different result" from what might occur outside bankruptcy (*e.g.*, the discharge of SLV through stock distributions rather than cash), the Bankruptcy Code takes priority. *Travelers*, 127 S. Ct. at 1205 (citations omitted).

## V.    THE BANKRUPTCY COURT PROPERLY EXCLUDED EXTRINSIC EVIDENCE

DFO argued that the Bankruptcy Court should interpret the TIAs based on DFO's alleged "intent," which was to recover compensation for taxes. DFO Response at 3-7. The Bankruptcy Court correctly held that the parties had conflicting intents, and that it would not be proper to interpret any contract based solely on the interests and goals of one party:

> The objections and intentions of all parties to any particular agreement or series of agreements must necessarily conflict. The inherent adversity of objectives between contracting parties is precisely what is resolved by the process of negotiation reducing the parties' respective compromises in their negotiating demands to a consensus reflected in a written agreement. It is the

written agreement, not the differing objectives or intentions of the parties, that must govern.

Decision at 12.

DFO also contended (in the Second DFO Motion) that the Bankruptcy Court had found an "ambiguity" in Section 7(c), Second DFO Motion at 1-2, 14-15, and offered affidavits as to DFO's subjective interpretation of the provisions. *Id.* at 14-15. However, DFO had previously argued that Section 7(c) was "unambiguous" and required no such extrinsic evidence. *See* First DFO Motion at 8-9; *see also* March 30, 2007 Hearing Tr. at 57 [D 28] (statement by DFO counsel that "we all agree" that the contracts "are not ambiguous"). Extrinsic evidence is not proper where the contracts are not ambiguous. *See Schmidt v. Magnetic Head Corp.*, 468 N.Y.S.2d 649, 654 (N.Y. App. Div. 1983); *see also 805 Third Avenue Co. v. M.W. Realty Assocs.*, 448 N.E.2d 445, 447 (N.Y. 1983).

Moreover, the affidavits filed by DFO were not based on communications between the parties; instead, they represented nothing other than DFO's alleged subjective intents, without even an allegation that DFO's interpretations had been communicated to Delta. The Bankruptcy Court properly held that this evidence would not have been proper, even if an ambiguity had existed. *See* November 6 Hearing Tr. at 26-27; *Havel v. Kelsey-Hayes Co.*, 445 N.Y.S.2d 333, 335 (N.Y. App. Div. 1981) (an unexpressed subjective "intent" that was not communicated to the other party is not admissible as evidence); *Zion v. Kurtz*, 405 N.E.2d 681, 687 (N.Y. 1980) (same); *Kates v. Yeshiva University,* 227 N.Y.S.2d 718, 721 (N.Y. Sup. Ct. 1962) (same).

## VI.    THE LAW REQUIRES DISALLOWANCE OF DUPLICATIVE CLAIMS TO THE EXTENT OF THE OVERLAP

The Bankruptcy Court correctly disallowed the TIA Claims based on the plain language of Section 7(a). Alternatively, those claims should have been disallowed because they are already encompassed within the SLV Claims.

20

A claimant often may be entitled to recover for a single injury based on multiple legal theories; yet a loss provides a claimant with only one right of payment, no matter now many separate legal theories the claimant may invoke in support of that right of payment. *See, e.g.*, *Diversified Graphics, Ltd. v. Groves*, 868 F.2d 293, 295 (8th Cir. 1989) ("Regardless of whether the harm was the result of negligence or breach of fiduciary duty or a combination of both, there is only a single injury and there may only be a single recovery.") (citation omitted). This rule applies in bankruptcy cases as well. For bankruptcy purposes, a "claim" is a "right to payment." 11 U.S.C. § 101(5) (2007). The existence of multiple theories under which recovery may be sought from a debtor does not change the fact that a single loss gives rise to a single right to payment and therefore a single "claim" against the debtor. *See, e.g.*, *In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey*, 160 B.R. 882, 894 (Bankr. S.D.N.Y. 1993) ("multiple recoveries for an identical injury are generally disallowed.") (citation omitted).

In *Finley*, the debtor had failed to make required pension plan contributions, resulting in an underfunding of its pension plan. *Id.* at 893. Both the pension plan trustee (the "Trustee") and the Pension Benefit Guaranty Corporation (the "PBGC") filed claims against the debtor. While the claims were based on different legal theories and filed by different parties, they related to the same "loss" – the economic effect on the pension plan of the debtor's failure to make required payments. The bankruptcy trustee objected to the claims, arguing that both claims sought recovery for an identical injury. *Id.*

The Trustee and the PBGC argued that their claims arose from different legal rights and that any overlap should only be reduced to the extent that the debtor's estate actually paid the claims in "bankruptcy dollars," not to the extent the claims were allowed in pre-bankruptcy dollars. *Id.* The bankruptcy court rejected this position, noting that the claims sought

21

compensation for the same loss and that the allowance of both claims, or the reduction of the

claims to the extent of payment in "bankruptcy dollars," would result in a distribution regarding

the loss which would exceed the ratable distribution to other unsecured creditors. *Id*. at 894.

Other cases have also reached the same conclusion. *See, e.g.*, *In re Simetco, Inc.*, No. 93-

61772, 1996 WL 651001, at *3 (Bankr. N.D. Ohio Feb. 15, 1996) (disallowing claim to extent it

related to the same loss covered by another claim); *In re Chateaugay Corp.*, 115 B.R. 760, 783-

84 (Bankr. S.D.N.Y. 1990), *aff'd*, 130 B.R. 690 (S.D.N.Y. 1991), *vacated by agreement*, Nos. 89

Civ. 6012, 90 Civ. 6048, 1993 WL 388809 (S.D.N.Y. June 16, 1993) (holding claims for unpaid

contributions and claims for "plan insufficiency" were duplicative of each other); *In the Matter

of Brinke Transp., Inc.*, No. 87-03785, 1989 WL 233147, at *3 (Bankr. D.N.J. Jan. 23, 1989)

(striking claims subsumed in other claims).

The Bankruptcy Court rejected this general argument and held that parties are free, in

separate contracts, to provide for multiple recoveries for a single loss. Decision at 7-8. The

Bankruptcy Court's decision rested on three errors of law.

<u>First</u>, the Bankruptcy Court incorrectly decided that contract claims should be treated

differently from other claims, because other claims involve a right to recover for an "injury,"

Decision at 7, while in the Bankruptcy Court's view, parties are free to "contract[] to pay

duplicative claims" if they wish, regardless of the actual loss. *Id.* at 8. Outside of bankruptcy,

however, contract claims must be based on actual losses. A contractual agreement to pay an

amount, upon default, that is not based on the other party's actual loss is contrary to public

policy and void as a penalty. *See, e.g.*, *In re T.R. Acquisition Corp.*, 309 B.R. 830, 837-38

(S.D.N.Y. 2003) (lease provision calling for double rent if tenant failed to vacate was

disproportionate to damages suffered and an unenforceable penalty). If, as DFO contends, the

Leases and the TIAs required Delta to compensate for the same loss twice, the double payment would be an unenforceable penalty. *See also* 11 U.S.C. § 502(e) (2007) (barring creditor and guarantor from asserting duplicative claims against bankruptcy estate).

Second, the Bankruptcy Court erroneously believed that the contract obligations addressed different debts owed to "different parties" because amounts payable under the Leases are received by the Indenture Trustee (as assignee) while amounts payable under the TIAs are received by DFO. However, the Indenture Trustees are not parties to the Leases. Delta entered into the Leases with the Owner Trusts. The Indenture Trustees, as pledgees, merely stand in the shoes of the Owner Trustees to collect sums due under the Leases.

As described above, the Owner Trusts are "grantor trusts" that exist solely for the benefit of the Owner Participants. For tax purposes, the Owner Trustee has no separate existence; the Owner Trustee and Owner Participant are the same entity. The SLV Claims and the TIA Claims provide different legal theories under which a single loss (DFO's tax loss) may be recovered by a single party (DFO).

Third, the Bankruptcy Court did not take account of the multiple liability that would arise if more than one claim were allowed for a single loss. Assume, for example, that the required SLV payment were $100, of which $25 represented the "tax" component. If Delta paid the $100 SLV claim out of bankruptcy, the TIA Claim admittedly would be extinguished, and Delta's total payment obligation would be $100. The bankruptcy "claims" asserted by the Indenture Trustee and by DFO similarly should not exceed $100 – the amount of their collective "right to payment" outside of bankruptcy. *See* 11 U.S.C. §§ 101(5), 502 (2007). The Bankruptcy Court's holding, however, would permit bankruptcy claims to exceed the out-of-bankruptcy "right to payment," to the disadvantage of other creditors and contrary to Section 101(5).

To the extent that SLV Claims and TIA Claims (which by their nature are already included in SLV Claims) are designed to provide compensation for the same loss incurred by the same party, they simply represent multiple legal theories upon which the same loss may be recovered.  For bankruptcy purposes, a single loss can give rise to only one "right to payment" and only one claim against the debtor, regardless of how many separate contractual theories of recovery may be asserted.

*[Remainder of page intentionally left blank]*

## CONCLUSION

For all of the foregoing reasons, and those stated in the Bankruptcy Court's Decision,

Delta and the Committee submit that the Disallowance Order and the Reconsideration Order

should be affirmed.[3]

Dated:  New York, New York   Respectfully submitted,
    March 3, 2008

            DEBEVOISE & PLIMPTON LLP


            /s/ Michael E. Wiles
            Michael E. Wiles
            919 Third Avenue
            New York, New York 10022
            Telephone:  (212) 909-6000
            Facsimile:   (212) 909-6836
            Special Aircraft Attorneys for Reorganized Debtors

            AKIN GUMP STRAUSS HAUER & FELD LLP


            /s/ David H. Botter
            David H. Botter
            Drake Foster
            590 Madison Avenue
            New York, NY 10022
            Telephone: (212) 872-1000
            Facsimile: (212) 872-1002
            Counsel for the Post-Effective Date Committee

---

[3] The Bankruptcy Court did not find it necessary to determine whether SLV Claims would have to be reduced if any TIA Claims were allowed.  *See* August 20 Hearing Tr. at 156-159. If for any reason the Orders were to be reversed and any TIA Claims were to be allowed, the Bankruptcy Court would need to decide that issue.