**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT NEW YORK**

———————————————————— :
: 
**DFO PARTNERSHIP,**                                      :          Case No.  07-CV-11437  (RMB)
:          (ECF Case)
                                        **Appellant,**   :
:
                   **v.**                                :
:
**DELTA AIR LINES, INC., and**                           :
**THE POST-EFFECTIVE  DATE**                             :
**COMMITTEE,**                                           :
:
                                        **Appellees.**   :
———————————————————— :


<u>**APPELLANT'S REPLY BRIEF**</u>

KAYE SCHOLER LLP
Richard G. Smolev (RS 2222)
Piper A. Brock (PB 6335)
425 Park Avenue
New York, New York  10022
(212) 836-8000 (telephone)
(212) 836-8689 (facsimile)

*Counsel for Appellant*
*DFO Partnership*

31613295.DOC

This brief replies to the points made by Appellees Delta and the Committee and by Cargill and Wilmington (the "Debt Parties") in their respective opening briefs. As SVP merely reserved rights, no response is required to its papers.

The question before this Court is whether the Supreme Court's *Butner* and *Travelers* decisions and their related line of cases require allowance of the DFO Claims if they would be allowed in a state court proceeding. Appellees do not dispute that those cases mandate that result. Rather, they argue that *Travelers* gives way to the bankruptcy principle that claims against a debtor may be discharged through stock distributions under a plan.

This argument misses the point. DFO agrees that once its TIA claims are allowed, those claims may be treated in the same way that all unsecured claims are treated under Delta's plan of reorganization. But before any court gets to the question of how an allowed claim may be treated, it first has to ask whether the claim would be allowed had bankruptcy not intervened.

Appellees make three additional points that are worth noting. The first is that they acknowledge that lease remedies are not self-executing. Although the exclusion in the DFO Tax Indemnity Agreements is triggered by an event under which Delta is "required to pay SLV," this is not an automatic obligation upon lessee default. Rather, the lessor (or, the indenture trustee as the assignee of its rights) must select which remedy it chooses to enforce. Here, that remedy was documented in the Bingham Term Sheet and Restructuring Agreements under which Delta and its cooperating indenture trustees agreed that the SLV claim would be satisfied through a combination of an allowed claim and negotiated credits for the residual value of the Aircraft that it obtained through foreclosure[1] and the present value of the restructured lease.

---

[1] As Delta merely leased the Aircraft, it had no right to the residual value at the end of the lease term. The Bankruptcy Court never explained how a negotiated credit for something
(continued...)

Delta plainly could not argue in a state court that the combination of a claim, chattel paper and a credit constitute payment of SLV. In the first place, the state court would give effect to the unambiguous defined term that the parties used and held that SLV is a specific number derived from a calculation specified in the Lease and not some lesser number. D-22, Ex. A (Lease), definition of "Stipulated Loss Value" at 11.[2] Second, even if the state court were inclined to move away from the defined term and to ask whether SLV contained some implied netting concept, the court would look to the lease to determine precisely what Delta would pay in a remedies scenario and then compare that amount to what it was paying under its agreement with the indenture trustees for the Debt Parties.

Here, the DFO leases provide that when the lessor enforces remedies but does not obtain possession of the aircraft and demands that Delta pay SLV minus the fair market value of the Aircraft, fair market value is deemed zero, so Delta pays full SLV, without offsets.

Appellees try to get around this lease provision by using quotation marks to describe the mechanics of the DFO leases. At page 13 of their brief, Delta and the Committee say that fair market value being deemed zero is limited to situations where the lessor can not "obtain 'possession'" of the aircraft (and then give an example that was not supported by the lease or by any testimony in the Bankruptcy Court). Similarly, the Debt Parties use the phrase "'obtain' possession" on page 13 of their brief.

Appellees' effort to read some notion of constructive possession into the leases is just wrong. The leases plainly say that if the lessor does not obtain possession *pursuant to Section*

---

that Delta never owned and could not monetize could be something that Delta "paid" for purposes of triggering the TIA exclusion.

[2]    DFO cited the authorities supporting this principle of contract interpretation on page 20 of its opening brief.

*15(a) hereof,* (D-22, Ex. A (Lease) § 5(a)(iii) at 17-18) fair market value for purposes of Section

15(c) [the remedy section that requires Delta to pay SLV minus fair market value] is deemed

zero. Section 15(a) of the lease allows the lessor to demand possession *in the manner and*

*condition required by, and otherwise in accordance with all of the provisions of, Section 5*

*hereof.* D-22, Ex. A (Lease) § 15(a) at 54. Section 5 of the lease contains detailed physical

delivery protocols of aircraft in a specified condition to a location in the continental United

States. D-22, Ex. A (Lease) § 5(c) at 19-21.

      Clearly, if Delta and the Debt Parties had asked a state court to find that fair market value

were to be deemed something other than zero - and that Delta thus paid SLV so as to trigger the

exclusion in the tax indemnity agreement because the Debt Parties were able to extract value

from the aircraft without physical possession - they could point to no provision in the lease to

support that proposition. Rather than read "net SLV" in place of "SLV" in the tax indemnity

agreement and finding that what Delta was paying under the Bingham Term Sheet and the

Restructuring Agreements was close to what it would be paying in a remedies scenario, if it were

not going to enforce the defined term "SLV" as written, the Bankruptcy Court should have asked

(as a state court would have done) specifically what Delta would be required to pay when its

lessor does not take physical possession of the aircraft in accordance with the terms of the DFO

leases and then compared that amount to the amount Delta was required to pay under the

Restructuring Agreements.

      In addition to its error regarding the amount that Delta would pay in a remedies scenario

where the lessor does not take possession of the aircraft, the Bankruptcy Court also erred in

determining the manner in which SLV had to be paid so as to trigger the contested exclusion in

the tax indemnity agreements. The Bankruptcy Court looked to dictionary definitions of the

meaning of the word "pay" even though (as discussed at pages 15 and 16 of Appellant's Opening Brief on Appeal) the parties already mandated that all of Delta's payments were required to be in U.S. Dollars and in immediately available funds.  The obligation to pay SLV falls within the defined term "Supplemental Rent" under the DFO leases.  Delta is obligated to pay Supplemental Rent in U.S. Dollars and in immediately available funds whether that payment is made under the leases or the tax indemnity agreements because under New York law, all writings forming a part of a single transaction are to be read together, consistent with the purpose of the transaction, so the manner of payment detailed in the leases governs all instances where an SLV payment was required under the operative documents.  *See This is Me, Inc. v. Taylor*, 157 F.3d 139, 143 (2d Cir. 1998).  None of the Appellees disputed the fact that Section 20 of the DFO Leases (discussed at page 16 of DFO's opening brief) mandate that these payment terms are unaffected by Delta's bankruptcy, which is conclusive evidence that the Bankruptcy Court ignored of the parties' expectations regarding the impact of Delta's bankruptcy on its obligations under the operative documents.

Before it ignored the provisions that specified Delta's payment obligations under the operative documents in favor of its own dictionary definitions, the Bankruptcy Court should have taken testimony from the parties (or have given effect to the unrebutted testimony of the Gebler and Menaker Affidavits) for the Second Circuit has held that "Dictionary definitions are not determinative of the meaning of [disputed contract terms.]"  *See Alexander & Alexander Services, Inc. v. Lloyd's*, 136 F.3d 82, 87 (2d Cir. 1998).

Courts frequently underscore the fact that contract interpretation requires more than ascribing the "plain" meaning of words to the contract terms at issue.  Examples abound of courts admitting parol evidence in order to clear up an ambiguity they perceived in contract

terms with seemingly obvious and indisputable meanings. *See, e.g., Garza v. Marine Trans. Lines Inc.*, 861 F.2d 23, 28 (2d Cir. 1988) (finding ambiguity in the term "loss or damage"); *see also Parks Real Estate Purchasing Group v. St. Paul Fire and Marine Ins. Co.*, 472 F.3d 33, 45 (2d Cir. 2006) (finding ambiguity in the term "contamination"); *UBS Sec. LLC v. Finish Line, Inc.*, No. 07-10382, slip op. at 12 (S.D.N.Y. Feb. 22, 2008) (finding ambiguity in the terms "material and adverse" and "reasonable discretion"); *Alexander & Alexander Services, Inc.*, 136 F.3d at 87 (finding ambiguity in the term "client"); *G. Golden Associates of Oceanside, Inc. v. Arnold Foods Co., Inc.*, 870 F.Supp. 472, 479 (E.D.N.Y. 1994) (finding ambiguity in the term "products"); *LTV Corp. v. Aetna Cas. & Sur. Co. (In re Chateaugay Corp.)*, 116 B.R. 887, 903 (Bankr. S.D.N.Y. 1990) (finding ambiguity in the term "terminated"); *Thorington v. Smith*, 75 U.S. 1, 12-14 (1868) (finding ambiguity in the term "dollars"); *DeWitt v. Kaiser*, 484 A.2d 121, 126 (Pa. Super. Ct. 1984) (finding ambiguity in the term "income"); *Daset Mining Corp. v. Indus. Fuels Corp.*, 473 A.2d 584, 587-94 (Pa. Super. Ct. 1984) (court defines "recoverable bituminous coal"). Thus, "where the text of an agreement reasonably allows for varying interpretations-whether by the inadvertence or design of the draftsman-the need for judicial construction cannot, and may not, be avoided." *Wards Co., Inc. v. Stamford Ridgeway Associates*, 761 F.2d 117, 120 (2d Cir. 1985).

The Debt Parties argue that as the SLV claims have been discharged, Delta must be "paying SLV" for purposes of triggering the exclusion in the tax indemnity agreements. This is the "cosmic argument" that Judge Hardin rejected in the Decision when he held that debtors can be liable for more than one claim if the governing documents so provide.

Moreover, this argument ignores the fact that the tax indemnity agreements are a guarantee of the tax treatment that a taxpayer will have in a transaction and an agreement to

indemnify the taxpayer for any additional taxes incurred if the actual tax treatment is different from the one promised. Jeffrey H. Khan, *The Mirage of Equivalence and the Ethereal Principles of Parallelism and Horizontal Equity*, 57 Hastings L.J. 645, 669 (2006). The fact that SLV (which contains amounts necessary to reimburse DFO for both its investment and tax exposure) is pledged to the indenture trustee does not mean that DFO has no claim. Rather, because Delta's indemnity obligation is set forth in a separate agreement that is not pledged and that may be enforced only by DFO, the rights and obligations of DFO and Delta under the tax indemnity agreements must be analyzed as would any claim between a debtor and a party holding a guarantee.

The Decision turns the law of guarantees on its head. If the Bankruptcy Court's conflation of claim allowance and payment is allowed to stand, parties will file bankruptcy, allow claims for the full amount of a claim that may be worth pennies on the dollar and then argue that the parties to whom they owe guarantee obligations can recover nothing. No borrower, guarantor or lender would expect this result in modern commercial practice. Indeed, this is not the law, as courts have held that the very purpose of obtaining a guarantee is to ensure payment in the event of a bankruptcy or inability to pay by the primary obligor. *See, e.g., Aetna Cas & Sur. Co. v. Namrod Development Corp*, 140 B.R. 56, 60 (S.D.N.Y. 1992) ("The very purpose of having defendants personally guaranty the payment and performance bonds was to provide an alternate avenue of recovery in case payment from [debtor] was not forthcoming.").

Nothing in either the DFO operative documents or in the Bankruptcy Code precludes allowance of the DFO Claims merely because the Debt Parties received an allowed claim that (coupled with the negotiated credits) represents the full amount of their recovery against Delta. In fact, the existence of Section 502(e)(1)(B) of the Bankruptcy Code (governing reimbursement

and contribution claims) demonstrates that when Congress desires to have the allowance of a claim by a debtor in favor of one creditor impact the claim of other parties against the debtor it enacts a statute to accomplish that purpose. *See, Juniper Dev. Group v. Kahn (In re Hemingway Transp., Inc.)*, 993 F.2d 915, 923 (1st Cir. 1993). Nothing in the Bankruptcy Code supports Appellees' argument that a contractual triggering mechanism in the DFO tax indemnity agreements, which triggers only upon full payment, may be overridden by discharge in bankruptcy of a debt owed to a different creditor and based on only a partial payment.

Finally, the Debt Parties suggest that Judge Gropper, hearing a similar challenge to tax indemnity claims in the Northwest Airlines bankruptcy case, approved of the Bankruptcy Court's ruling. Having strayed into another bankruptcy where the same issues are being tried, it was incumbent upon the Debt Parties to be more forthcoming with this Court about what actually is happening in the Northwest bankruptcy.

Unlike Judge Hardin, who refused to consider extrinsic evidence and turned to dictionary definitions to support his rulings, Judge Gropper is giving all owner participants the opportunity to make a complete record regarding their understanding of the meaning of their respective tax indemnity agreements. In one recent trial, Judge Gropper even suggested that the issue raised in the two airlines' objections to their tax indemnity claims might need to be resolved by the Second Circuit. *See* Transcript of Hearing Before the Honorable Allan L. Gropper, United States Bankruptcy Judge, at 14-19, *In re Northwest Airlines Corp.*, Case No. 05-17930 (ALG) (Bankr. S.D.N.Y. Feb.13, 2008) (a portion of which is attached hereto as Exhibit A).

It is too early to tell how Judge Gropper will rule on any of the matters before him, but his process is the correct one, for he is attempting to discern the meaning of words that may appear on their surface to be without controversy but that may be subject to different

interpretation in the actual contracts in which they are used.  This is consistent with both the *Butner* and *Travelers* line of cases and Second Circuit rulings regarding contract interpretation. The Second Circuit recognizes that a contract is ambiguous when it is reasonably susceptible to more than one reading or one as to which reasonable minds could differ.  *Allianz Ins. Co. v. Lener*, 416 F.3d 109, 113 (2d Cir. 2005); *see also UBS Sec. LLC v. Finish Line, Inc.*, No. 07-10382, slip op. at 12 (S.D.N.Y. Feb. 22, 2008) and that a court should not impose its own interpretation as a substitute for hearing extrinsic evidence to ascertain the intent of the parties. *See Scholastic, Inc. v. Harris*, 259 F.3d 73, 82 (2d Cir. 2001).

The foregoing authority strongly suggests that if the Bankruptcy Court were not going to give effect to the defined terms or lease provisions that the parties used in their agreements the Bankruptcy Court should have taken evidence from the parties regarding their understanding of the meaning of the phrase "required to pay SLV" and then applied that understanding to the specific facts before it rather than impose its own interpretation that finds no support in the agreements that the parties used to memorialize their understanding.

*[remainder of page intentionally left blank]*

## CONCLUSION

For the foregoing reasons, the Order of the Bankruptcy Court should be reversed or, in the alternative, remanded for further proceedings.

Dated: New York, New York
      March 10, 2008

KAYE SCHOLER LLP

_Richard G. Smolev_

Richard G. Smolev (RS 2222)
Piper A. Brock (PB 6335)
425 Park Avenue
New York, New York 10022
(212) 836-8000 (telephone)
(212) 836-8689 (facsimile)

*Counsel for Appellant*
*DFO Partnership*

# EXHIBIT A

```
 1                    UNITED STATES BANKRUPTCY COURT
                      SOUTHERN DISTRICT OF NEW YORK
 2
                                      .  Chapter 11
 3                                    .
                                      .  Case No. 05-17930 (ALG)
 4     IN RE:                         .
                                      .  (Jointly Administered)
 5     NORTHWEST AIRLINES             .
       CORPORATION, et al,            .  New York, New York
 6                                    .  Wednesday, February 13, 2008
                                      .  A.M. Session
 7         Reorganized Debtors.       .  Volume 1 of 2
       . . . . . . . . . . . . . . .  .  10:29 a.m. to 12:20 p.m.
 8
                            TRANSCRIPT OF HEARING
 9              BEFORE THE HONORABLE ALLAN L. GROPPER
                    UNITED STATES BANKRUPTCY JUDGE
10     APPEARANCES:

11     For the Debtors:              Nathan A. Haynes, Esq.
                                     CADWALADER, WICKERSHAM & TAFT, LLP
12                                   One World Financial Center
                                     New York, New York 10281
13
                                     Mark C. Ellenberg, Esq.
14                                   Douglas S. Mintz, Esq.
                                     CADWALADER, WICKERSHAM & TAFT, LLP
15                                   1201 F Street N.W.
                                     Washington, D.C. 20004
16
       For the Post-Effective
17     Date Committee:              Lorenzo Marinuzzi, Esq.
                                     Jordan A. Wishnew, Esq.
18                                   OTTERBOURG, STEINDLER, HOUSTON
                                      & ROSEN, P.C.
19                                   230 Park Avenue
                                     New York, New York 10169
20
       Audio Operator:              Electronically Recorded
21                                   by Court Personnel

22     Transcription Company:       Rand Reporting & Transcription, LLC
                                     80 Broad Street, Fifth Floor
23                                   New York, New York 10004
                                     (212) 504-2919
24                                   www.randreporting.com

25     Proceedings recorded by electronic sound recording, transcript
       produced by transcription service.
```

```
 1   APPEARANCES:   (Continued)

 2   For ALG:                    Thomas G. Macauley, Esq.
                                 ZUCKERMAN SPAEDER, LLP
 3                               919 Market Street, Suite 990
                                 Wilmington, Delaware 19899
 4
     For General Foods Credit
 5   Corporation:               David F. Abbott, Esq.
                                 John M. Conlon, Esq.
 6                               Andrew R. Taggart, Esq.
                                 MAYER BROWN, LLP
 7                               1675 Broadway
                                 New York, New York 10019
 8
                                 John J. Voorhees, Esq.
 9                               MAYER BROWN, LLP
                                 71 S. Wacker Drive
10                               Chicago, Illinois 60606

11   For BAE Systems (Funding
     One) Limited:               Ken Coleman, Esq.
12                               Todd S. Fishman, Esq.
                                 Tania Ingman, Esq.
13                               ALLEN & OVERY, LLP
                                 1221 Avenue of the Americas
14                               New York, New York 10020

15   For AT&T Credit Holdings:   Richard G. Smolev, Esq.
                                 KAYE SCHOLER, LLP
16                               425 Park Avenue
                                 New York, New York 10022
17

18

19

20

21

22

23

24

25
```

1
<u>INDEX</u>
(Volume 1 of 2)

2

3                                                        <u>Page</u>

<u>REORGANIZED DEBTORS' TIER III(b) OBJECTION</u>                5
4 (Re:   ALG DC-9, LLC)

5 <u>STATUS CONFERENCE</u>                                          11
(Re: Forty-First Omnibus Objections to Claim)

6
                        * * * * * * *
7

                    <u>EVIDENTIARY HEARING</u>
8
                                                       <u>Page</u>
9 <u>REORGANIZED DEBTORS' OBJECTION TO PROOF OF CLAIM</u>
<u>NO. 3955 FILED BY GENERAL FOODS CREDIT CORPORATION</u>
10      Preliminary Arguments and Motions                 17

11 <u>WITNESS</u>              <u>DIRECT</u>  <u>CROSS</u>  <u>REDIRECT</u>  <u>RECROSS</u>

12 <u>FOR THE CLAIMANT</u>
THOMAS URBACH          38     59      69        72
13

14

15

16 <u>Exhibits</u>                              <u>Ident.</u>   <u>Evid.</u>

17 Joint Exhibits A through E                          36

18 Claimaint's 1 through 9                             36

19

20

21

22

23

24

25

4

1      (Proceedings commence at 10:29 a.m.)

2          THE COURT:  All right.  May I have appearances,

3 please, in <u>Northwest</u>.

4          MR. ELLENBERG:  If the Court please, Mark Ellenberg,

5 Cadwalader, Wickersham & Taft.  With me at counsel table today

6 are Douglas Mintz and Nathan Haynes.

7          MR. ABBOTT:  And on behalf of General Foods Credit

8 Corporation, David Abbott from Mayer Brown, LLP.

9          MR. CONLON:  John Conlon from Mayer Brown.

10          MR. TAGGART:  Andrew Taggart from Mayer Brown.

11          MR. VOORHEES:  John Voorhees from Mayer Brown.

12          MR. MARINUZZI:  Good morning, Your Honor.  Lorenzo

13 Marinuzzi, Otterbourg, Steindler, Houston & Rosen, with Jordan

14 Wishnew, on behalf of the Post-Effective Date Committee.

15          MR. COLEMAN:  Your Honor, Ken Coleman, Allen & Overy,

16 on behalf of BAE, together with my partner Todd Fishman.

17          MR. FISHMAN:  Good morning.

18          MR. MACAULEY:  Your Honor, Thomas Macauley, Zuckerman

19 Spaeder, on behalf of ALG.

20          MR. ELLENBERG:  Your Honor --

21          THE COURT:  Anyone else appearing today?  Does anyone

22 else intend to speak?

23    (No verbal response.)

24          MR. ELLENBERG:  If there are no other appearances, the

25 big event today is the objection to the GFCC claim; however,

5

1   Mr. Haynes has a few preliminary matters.

2           THE COURT:  All right.

3           MR. HAYNES:  Good morning, Your Honor.  Nathan Haynes,

4   Cadwalader, Wickersham & Taft, for the debtors.

5           Your Honor, turning your attention to Item 2 on the

6   contested matters, today is the scheduling -- or rather, the

7   status conference with respect to the reorganized debtors' Tier

8   III(b) Objection to certain proofs of claim filed byu ALG DC-9,

9   LLC

10          Your Honor, the subject of these claims are two -- are

11  a damages claim arising from the rejection of two leases.  The

12  claimants is seeking approximately $15 million.  The debtors'

13  view of the situation is that, upon full performance of the

14  lease, it would have netted ALG only $1.3 million, resulting in

15  a thirteen-million-dollar windfall.  Accordingly, Your Honor,

16  the debtors objected on the basis that it was an unenforceable

17  penalty.

18          Your Honor, the debtors believe that the Court can

19  determine the penalty issue as a matter of law and without any

20  factual discovery.  ALG's counsel has requested that discovery

21  proceed, and has declined to execute our scheduling stipulation

22  that would provide for a hearing some point at the end of March

23  with respect to the penalty issue.

24          Your Honor, the debtors believe that the Court can

25  rule and should rule with respect to the penalty issue prior to

6

1   the debtors having to expend their resources to respond to

2   discovery, which the debtors believe will ultimately have no

3   bearing on the legal issues in the matter.  To the extent that

4   ALG believes there are factual issues that need to be

5   addressed, they can certainly raise that in response to our

6   objection, and those matters will be heard together at the

7   hearing on the objection.

8              THE COURT:  Have you filed your objection yet?

9              MR. HAYNES:  We have.

10             THE COURT:  You have.

11             MR. HAYNES:  Yes, Your Honor.

12             THE COURT:  All right.

13             MR. MACAULEY:  Good morning, Your Honor.  Thomas

14   Macauley on behalf of ALG.

15             Your Honor, this is an issue of two aircraft leases,

16   and the debtors have argued under U.C.C. 2A, Section 504, that

17   the amount is unreasonable in light of the then-anticipated

18   harm caused by the default.  Your Honor, that's an inquiry that

19   goes into the formation of the lease and the negotiation of the

20   lease.  It's a heavy burden under Article 2A because liquidated

21   --

22             THE COURT:  What discovery do you want?

23             MR. MACAULEY:  Your Honor, ALG -- the lease dates from

24   1996.

25             THE COURT:  Let me ask you again.

7

```
 1              MR. MACAULEY:  Okay.

 2              THE COURT:  What discovery do you want?

 3              MR. MACAULEY:  Okay.  We want discovery --

 4              THE COURT:  You want to go back -- it dates to 1996.

 5   Do you want to go back to 1894 and tell me about the

 6   development of the air -- I guess we should start at 1903.

 7              MR. MACAULEY:  Fortunately, the aircraft are not that

 8   old, Your Honor.

 9              THE COURT:  All right.

10              MR. MACAULEY:  Your Honor, we'd like to go back and

11   understand the lease formation.  We were an assignee of the

12   lease, so we came into the -- we bought the aircraft in 2000,

13   and the lease goes back to 1996, and it supersedes a lease from

14   1987.

15              We believe that the -- we believe the people at

16   Northwest are still there that have knowledge.  We also believe

17   that -- this is a stipulated loss provision that's a fixed

18   amount, as opposed to a declining value, and we believe there

19   is a reason for that, and we believe that's a provision that

20   Northwest would have wanted in there, as opposed to the lessor.

21   The reason for that is there's a particular provision in this

22   lease; it's a residual-sharing provision.  So, at the end of

23   the day, if everything works out right, Northwest -- the

24   aircraft gets sold, and Northwest gets half the proceeds.

25              So there is a little more than meets the eye here.
```

8

1  And we think 120 days for discovery is reasonable.  This is not

2  the type of issue that gets addressed, other than typically on

3  summary judgment or after an evidentiary hearing.  We certainly

4  don't want to expend any resources that we don't have to, but

5  they've got all the cards, Your Honor.  We're an assignee; we

6  don't have that information.

7          And so we'd like to understand why this provision was

8  put in the lease.  We're not sure whether it was put in the

9  lease in the 1996 version or the 1987 version.  We'd like to

10 understand who's around and who knows about this lease, and

11 we'd like to talk to them.

12          THE COURT:  All right.

13          MR. HAYNES:  Your Honor, Nathan Haynes, Cadwalader,

14 Wickersham & Taft, for the debtors.

15          Your Honor, this is essentially a math question.  You

16 add up the amount of damages that they're seeking, you add up

17 the remaining rent under the lease, and you compare them; and,

18 as a matter of law, it is a penalty.  We don't believe that

19 there's any insight that could be given from these 120 days of

20 discovery that's going to change that result.

21          Whether a liquidated damages provision is enforceable

22 is a question of law, and that's consistent with case law that

23 we cited in our objection, including the <u>Montgomery Ward</u>

24 <u>Holding Corp.</u> case out of the Third Circuit in 2003.  And it's

25 also clear as a matter of law that no liquidated damages

1  provision can put a lessor in a position legally superior to

2  that it would have occupied, had the lease been fully

3  performed.  Again, this is a question of mathematical figures

4  that can be calculated to a certainty, Your Honor.

5  THE COURT:  Well, usually math gets us into situations

6  like failures of hedge funds and long-term capital and the

7  like.

8  I think sixty days for discovery is adequate.  If you

9  need help on getting a case ready for trial quickly, I suggest

10  you talk to the counsel who are here today, because they've

11  gotten a matter that's much more complicated ready for trial

12  much more quickly.  If you have disputes, you certainly can

13  bother me with them, but it seems to me sixty days would be

14  fine.  Then, if you wish to make a motion or bring this on for

15  a hearing, you certainly may.  I don't know if you plan to file

16  -- do you plan to file anything further to put the issues in

17  sharper focus?

18  MR. HAYNES:  Well, other than the reply, no.  But of

19  course, we'll wait to see how the discovery pans out.

20  THE COURT:  All right.  Why don't we set another

21  pretrial -- not evidentiary, but pretrial -- and then we'll see

22  what we need.

23  Yes?

24  MR. MACAULEY:  Your Honor, the only concern I have is,

25  if we're working under sixty days, are we bound by the rules as

10

1   far discovery responses?  Because we're talking thirty days --

2           THE COURT:  I think the debtors should be more

3   forthcoming if you need more time.  If you can't do it within

4   sixty days, I'm sure I'll be told.

5           MR. MACAULEY:  Very well.

6           THE COURT:  But I think you really should -- you

7   should get started.

8           MR. MACAULEY:  Very well.

9           THE COURT:  When is your next -- or do you have a

10  hearing in approximately sixty days?

11          MR. HAYNES:  We don't have a hearing that far out,

12  Your Honor.  By your leave, I'll contact chambers after the

13  hearing, and then we'll set --

14          THE COURT:  Why don't we set another date; and if it's

15  seventy days out or eighty days, that's fine, you can certainly

16  have a little bit more time, if necessary.

17          MR. HAYNES:  Very well.

18          THE COURT:  I assume, by the way, that the initials of

19  your clients, "ALG," predated this case.

20      (Laughter.)

21          THE COURT:  And it's entirely a happenstance that

22  they're my initials.  So I certainly wouldn't want to have my

23  initials on any aircraft unnecessarily.

24      (Laughter.)

25          MR. MACAULEY:  That's correct, Your Honor.

11

1          THE COURT:  All right.

2          MR. HAYNES:  All right.  I'll get you an order.

3          THE COURT:  Thank you.

4          MR. MACAULEY:  Thank you, Your Honor.

5          MR. HAYNES:  Your Honor, secondly, to address a matter

6    that was raised in connection with the status conference on the

7    Northwest Forty-First Omnibus Objections to Claim, objections

8    to claims that occurred on January 24, Northwest and Bremer at

9    that time had discussed with the Court that they had reached a

10   consensual scheduling order with respect to the treatment of

11   the Bremer objection -- or rather, the debtors' objection to

12   the Bremer claim.

13         At that time, the Court advised that it would consider

14   the proposed order, but requested that Bremer attend the

15   discovery conference that the debtors were having with the rest

16   of the TIA claimants.  That has now occurred; and, therefore,

17   Bremer has reiterated its request that Northwest pursue the

18   litigation of the Bremer claim separately and on a faster track

19   than the other parties to the omnibus objection.

20         Accordingly -- or for among other reasons, Bremer does

21   not seek the extensive discovery sought by the other TIA

22   claimants in this matter.  Accordingly, Your Honor, we, again,

23   would respectfully request that the Court entertain a

24   scheduling order that provides for the hearing with respect to

25   the Bremer claim.

12

1          THE COURT:  All right.  What date did you have in mind

2    for that?

3          MR. HAYNES:  Your Honor, we have the -- we were

4    looking for a hearing date at some point in May of 2008,

5    preferably the latter half of the month.

6          THE COURT:  Is that going to be an evidentiary hearing

7    again?

8          MR. HAYNES:  Possibly, Your Honor.

9          THE COURT:  Well, why don't we put it -- is Bremer

10   here?

11         MR. HAYNES:  Yes.

12         THE COURT:  What's the hurry?  Other than the

13   opportunity to spend more money on counsel fees on both sides,

14   what's the hurry?

15         MR. BRANDON:  (As identified by ECRO)  Your Honor

16   (indiscernible) Bremer just feels that it's in a situation that

17   it would like -- we're in agreement with the debtor on the pace

18   of discovery, and there really isn't very much to do.  We think

19   our issues are fairly concise and can be handled very quickly.

20   As a matter of fact, we don't believe after discovery is

21   completed, the hearing will be necessary; it will likely be

22   settled.

23         THE COURT:  Well, you certainly can go forward with

24   discovery on a more expedited schedule.  The question in my

25   mind is:  How many different iterations of the same case should

13

1  the courts hear before the Second Circuit gets an opportunity

2  to decide the issues.

3         Now we're here to make whatever record the parties

4  want to make today, and my mind is open, as it always is.  But

5  we now have two decisions from Judge Hardin.  I assume their

6  issues are similar.  But you have your own language, and

7  everybody has a right to have their language examined with

8  extreme care.  But there are some general issues in these cases

9  that are eventually going to wind their way up to the Second

10 Circuit.  If anybody disagrees with that, please let me know.

11 And I just wonder how many different hearings we need to make -

12 - we need to have, excuse me, in order to prepare the record

13 appropriately.

14        MR. BRANDON:  Your Honor, might I suggest that the

15 scheduling order be entered and you remove the hearing date;

16 and, once the scheduling --

17        THE COURT:  I'll order the scheduling order, and you

18 certainly may go forward, and we will see where we are at the

19 next omnibus hearing.

20        MR. BRANDON:  Once discovery is complete, we'll come

21 back.

22        THE COURT:  All right.

23        MR. BRANDON:  Thank you.

24        MR. ELLENBERG:  Your Honor, I understand what you're

25 saying.  I would just like to say one thing about that.

14

1          There is a fair amount of interest in the company,

2    about getting the claims process wrapped up.  There are a

3    number of reasons why that's appealing to them.  If Your Honor

4    has read the newspapers, that may suggest some, but there's a

5    range of them, and so --

6          THE COURT:  Well, yes.  Speaking about "appealing,"

7    though, I mean, that does cause me to think of the word

8    "appeal."  There are appeal rights to all parties.  Do you

9    think that any of these issues are going to be finally

10   determined before the Court of Appeals gets its hands on the

11   issues?

12         I will be delighted -- and I'll say that to all of the

13   parties, I see a lot *amicus* here; the parties would get

14   together and settle every issue.  I gather you've settled a few

15   of these, or some of them.

16         MR. ELLENBERG:  And indeed, Your Honor --

17         THE COURT:  But it's not for me to do.  It's for me to

18   decide cases and to let parties make their record, and that's

19   what we're here today, but not necessarily to make the record

20   three and four and five times.

21         We now have, in the Delta case, one appeal to Judge

22   Berman; I know about that.  Then Judge Hardin's January

23   decision, where is that?  That, I'm told, is going to be

24   appealed.  Is that before Judge Berman now, too, or --

25         MR. SMOLEV:  Your Honor, Richard --

15

1          THE COURT:  -- is it still floating around in the

2    assignment phase?

3          MR. SMOLEV:  Richard Smolev on behalf of AT&T Credit

4    Holdings, both in <u>Delta</u> and here.

5          I filed a notice of appeal from the January decision

6    yesterday; it has not yet been given a judge.  And as I

7    mentioned the last time I was here, the appeal from DFO is now

8    in front of Judge Hollwell, and there is --

9          THE COURT:  DFO.

10         MR. SMOLEV:  There are three appeals from -- there are

11   now three separate appeals from Judge Hardin's rulings.

12         THE COURT:  Well, that's certainly constructive.

13   Three.

14         MR. SMOLEV:  One by Northwestern Mutual.

15         THE COURT:  Is that before Judge Berman?

16         MR. SMOLEV:  That is in front of Judge Berman.

17         One by DFO, which is also my client.  That's in front

18   of Judge Hollwell --

19         THE COURT:  That's certainly useful to have it before

20   two different judges.

21         MR. SMOLEV:  Well, no, we have a motion pending with

22   Delta, asking that that decision be moved -- or that appeal be

23   moved to Judge Berman because it comes out of the same order.

24   Judge Hollwell --

25         THE COURT:  You know, I suspect that that -- when the

16

1    Judge gets around to reading that, I suspect he will be happy

2    to --

3            MR. SMOLEV:  I would presume so.  But that's --

4    procedurally, that's where we are.

5            And then there was a question about a transfer of an

6    owner-participant interest, which is the Lonestar appeal.

7    That's in front of a different judge, and that I suspect will

8    stay in front of a different judge because that's a different

9    issue and it involves a different inclusion in the TIA.  But

10   procedurally that's where we are.  We don't have a judge yet

11   for the appeal from the January order.

12           THE COURT:  And Judge Hollwell is the appeal from my

13   October, I believe it was --

14           MR. ELLENBERG:  That's correct, Your Honor.

15           THE COURT:  And she's dismissed it, but there's been a

16   motion for reconsideration.  Has that been determined.

17           MR. ELLENBERG:  No, it has not, Your Honor.

18           THE COURT:  It has not.

19           So we have multiple judges, we have a procedure for

20   getting matters up -- well, it wouldn't apply in this case --

21   matters expedited up to the Second Circuit, which they've

22   already told us they don't want to take.  But we have an old

23   law case, anyway.

24           MR. ELLENBERG:  Your Honor, if I could just make two

25   further points.

17

1          THE COURT:  You can make all the points you want.

2          MR. ELLENBERG:  And I'm very much aware of the issues

3    Your Honor is making.  But, one, we have found that the

4    scheduling of these and moving forward on them does encourage

5    resolution.  We reached -- one of the *amici* who sought to join

6    this proceeding, National City, we actually settled with

7    yesterday.

8          And the second point is that -- and maybe the most

9    important one, is that, notwithstanding an appeal, an order of

10   this Court permits stock to be distributed.  And given the

11   volatility of the stock, that is valuable to the claimants.

12         And so, for example, this continuing proceeding with

13   GCC, as Your Honor will remember -- GFCC, as Your Honor will

14   remember, is holding up the distribution to BAE.  And to the

15   extent we can reach --

16         THE COURT:  I've never understood that, except GFCC

17   acting as spoiler, but it's not really my business.

18         MR. ELLENBERG:  The point is, Your Honor, a final

19   order of this Court, even if it's appealable, does permit the

20   stock to move.

21         THE COURT:  Well, I do say on the record that we have

22   a very effective mediation problem in this Court.  We have --

23   I'm sure we can find a lawyer in New York City who's not

24   conflicted and not already involved; if we look hard, we can

25   find a lawyer in another city.  I'm not expressing any views by

18

1   stating that, but I certainly am realistic enough to understand

2   that this is an issue that ultimately will be decided by the --

3   I think probably the circuit court; I don't think it will go to

4   Washington, but I think it will be decided ultimately by the

5   circuit court, maybe in our lifetimes.  I shouldn't say that to

6   you.  Maybe in my lifetime, I'll say that.

7           As to what I read about in the newspaper, it seems to

8   me that if there is going to be any merger with Delta, it will

9   give me an opportunity to transfer all of these cases to Judge

10  Hardin.

11      (Laughter.)

12          MR. SMOLEV:  Or vice-versa.

13          THE COURT:  Or vice-versa, yes.

14      (Laughter.)

15          THE COURT:  I think they should be merged, too, but

16  ...

17          But seriously, in all seriousness, you're here today

18  to make a record and to get a decision that I am sure neither

19  party has foresworn an appeal.  To state that otherwise, I

20  don't think any party has given up its right of appeal, and I'm

21  realistic enough to understand that.  We have -- if I go the

22  other way, we have now conflicting opinions; the other way from

23  Judge Hardin, we have conflicting opinions among the bankruptcy

24  judges.  There should be some, it seems to me, order here.  And

25  although I believe, as Judge Hardin has stated many times in

19

1    his opinions, that every agreement has to be looked at with

2    regard to its own specific terms, there are some broad issues

3    that the parties put forward, and they do go across the board.

4    And if we have multiple evidentiary hearings and multiple

5    decisions, I'm not sure that anybody ultimately benefits.  But

6    that's for another -- perhaps that's for another day.

7             Let's get on with today's hearing.

8             MR. ELLENBERG:  If the Court please, Mark Ellenberg on

9    behalf of Northwest.

10            We turn then, Your Honor, to Northwest's objection to

11   GFCC's claim.  The claim is based on a tax indemnity agreement

12   and it seeks a payment based on the fact that Northwest

13   rejected the lease, and GFCC's interest was foreclosed out by

14   the indenture trustee on behalf of BAE, who was the lender.

15            Now, Your Honor, we have been around this block

16   before.  As Your Honor, I'm sure, well remembers, we previously

17   presented a stipulation to you that allowed a claim to BAE;

18   that claim was based on SLV, stipulated loss value.  GFCC, of

19   course, objected, saying that SLV had to be reduced to reflect

20   the tax indemnification obligations; and that, thus, the claim

21   was overstated.

22            Your Honor approved the BAE stipulation, and in so

23   doing, the Court determined that no payment was due under the

24   applicable tax indemnity agreements -- there are actually five

25   of them, relating to five different aircraft, although the